**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| UNIVERSAL SURVEILLANCE CORPORATION dba UNIVERSAL SURVEILLANCE SYSTEMS 11172 Elm Avenue Rancho Cucamonga, CA 91730,<br><br>Plaintiff,<br><br>v.<br><br>CHECKPOINT SYSTEMS, INC. 2005 Market Street Philadelphia, PA 69103,<br><br>Defendant. | Civil Action No. _____<br><br>Judge _____<br><br><br><br><br><u>**COMPLAINT**</u><br><br>(JURY TRIAL DEMANDED) |

### I. Nature of the Action

1.    Defendant Checkpoint Systems, Inc. ("Checkpoint") is a monopolist.  For over forty years, Checkpoint has dominated sales of Electronic Article Surveillance ("EAS") systems used to detect theft in food and drug retail stores.  Checkpoint has at least an 80% share of the market for EAS systems sold to food and drug retail stores in the United States.

2.    In 2006, Checkpoint identified Plaintiff Universal Surveillance Corporation, dba Universal Surveillance Systems ("USS") as a serious competitive threat.  As an innovative, low-cost provider of EAS systems, USS had the potential to take significant share from Checkpoint.  In response to the competitive threat posed by USS, Checkpoint set out to

1   suppress competition from USS by proposing an agreement whereby Checkpoint could

2   distribute USS products; however, USS would be prohibited from soliciting or selling to

3   Checkpoint's customers.  Meanwhile Checkpoint had *no obligation* to distribute USS's

4   products.  USS recognized Checkpoint's proposed distribution agreement as nothing more than

5   an attempt to foreclose competition from USS and declined to engage in further discussions

6   with Checkpoint.

7          3.      Unable to disarm USS through the proposed anticompetitive distribution

8   agreement, Checkpoint instead resorted to a systematic campaign of exclusionary conduct to

9   stifle competition from USS, and any other actual or potential competitors in the market for

10  EAS systems sold to food and drug customers.  First, Checkpoint foreclosed a substantial share

11  of the market for EAS systems for food and drug customers by entering into long-term

12  exclusive contracts that prohibited customers from dealing with competing suppliers of EAS

13  systems.  Second, Checkpoint bundled its EAS tower product – in which it has a monopoly –

14  with its labels, tags, deactivators, and other EAS security equipment in an effort to exclude,

15  and ultimately eliminate, competition from more efficient suppliers of EAS systems for the

16  food and drug market.  Third, Checkpoint engaged in a strategy to disparage USS in the

17  marketplace by making misrepresentations about the company and its products with the intent

18  and effect of dissuading potential customers from purchasing EAS systems from USS.  Finally,

19  Checkpoint wrongfully induced former USS employees to violate the terms of their

20  confidentiality agreements with USS and disclose trade secrets, and wrongfully interfered with

21  USS's business relationships.

22         4.      Checkpoint's anticompetitive tactics have been remarkably successful.  In the

23  market for EAS systems sold to food and drug retailers, Checkpoint holds at least an 80%

24  share.  Indeed, in its most recent Annual Report, Checkpoint brags that it "enjoy[s] significant

25  market share, particularly in the supermarket, drug store, hypermarket, and mass merchandiser

26  market segments."  Checkpoint Systems, Inc., Annual Report (Form 10-K), 5 (Feb. 22, 2011).

27  Moreover, on its website, Checkpoint claims to "serve[] more than 90 percent of drug and

28  pharmacy retailers in the U.S."

5.      While remarkably successful for Checkpoint, its anticompetitive tactics have been devastating to USS as well as competition in the market for EAS systems sold to food and drug retailers.  Despite attempting to enter the EAS tower market in 2010 with a low-priced tower of equal or better quality, USS has been unable to gain any traction in this market and may soon be forced to abandon its efforts.  At the same time, food and drug consumers have been denied the opportunity to choose innovative EAS system products from more efficient suppliers, such as USS, and face the likelihood that competition will soon be eliminated altogether.

**II. The Parties**

6.      Plaintiff USS is a corporation organized and existing under the laws of California, having its principal place of business at 11172 Elm Ave, Rancho Cucamonga, California 91730.

7.      On information and belief, Defendant Checkpoint is a corporation organized and existing under the laws of Pennsylvania, having its principal place of business at One Commerce Square, 2005 Market Street, Suite 2410, Philadelphia, Pennsylvania 19103.

**III. Jurisdiction and Venue**

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 3 and 16 of the Clayton Act, 15 U.S.C. §§ 14 and 26, and the Lanham Act, 15 U.S.C. § 1125.

9.      This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 (diversity jurisdiction), as Plaintiff USS is a citizen of California and Defendant Checkpoint is a citizen of Pennsylvania.

10.     This Court also has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.

11.     Venue is proper in this District under 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) because Checkpoint transacts business in the Northern District of Ohio, and/or the claims arose at least in part in the Northern District of Ohio.

12.     Checkpoint regularly and continuously conducts business in interstate and foreign commerce between and among the several United States and foreign countries.  The interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was carried on, in part, within the Northern District of Ohio.

## IV. Interstate Commerce

13.     The acts complained of herein have occurred within the flow of, and have substantially affected, interstate trade and commerce.

## V. Background

14.     USS and Checkpoint sell EAS systems used to detect theft in food and drug retail stores.  EAS systems consist of several different products, including but not limited to: (1) security labels (adhesive labels that are affixed to the merchandise being secured); (2) security tags (hard tags that are attached to the merchandise being secured); (3) security tag/label deactivators (devices used to deactivate the security label or tag upon payment of the merchandise); and (4) security towers (towers used to detect tagged merchandise upon exit from the retail store).

15.     While food and drug retailers may sell some limited merchandise that requires a hard tag, the majority of products sold by these retailers require labels.  Security labels are generally used for small consumer products, such as bottles of pills or cosmetics.  For these types of items, it would be impractical to fasten a hard tag that is larger than the merchandise itself and which wastes valuable shelf space.

16.     Not only do food and drug retailers require security labels, but they require *flat* security labels that can be affixed to the merchandise.  For small consumer products, labels are typically placed to avoid overlap with branding or directions for the use of the product on the customer-facing portions of the item.  As a result, a non-flat label placed on the bottom of a product may cause the product to tip over.  Similarly, as described in more detail below, pressure from items stacked adjacent to or on top of the item itself could cause a non-flat label to deactivate. Also, it is more difficult to affix non-flat labels to items with curved packaging, as paper adhesive flat labels are more flexible than corresponding non-flat labels housed within

a three dimensional plastic casing.  Finally, with limited shelf space, retailers want security labels that take the least amount of space possible.  As such, there is an extremely strong preference among food and drug retailers for flat labels.

17.     There are two primary EAS system technologies presently in use in the United States:  Radio-Frequency ("RF") and Acousto-Magnetic ("AM").  All RF labels are flat.  No AM labels are flat.  Due to the intricacies of AM technology, it is not possible to produce a flat label.  RF EAS systems use a transmitter to create an interrogation zone where tags and labels are detected.  The transmitter, usually located within a tower positioned near a store exit, sends a signal that sweeps between 7.4 and 8.8 MHz (millions of cycles per second).  This transmitter signal energizes the RF label or tag when it enters the interrogation zone.  Unlike labels or tags in an AM EAS system, an RF label consists of a circuit containing a capacitor and coil (designed with a specific inductance value), both of which store electrical energy.  When the capacitor is connected together in a loop with the coil, the two components pass energy back and forth or "resonate."  The frequency at which the circuit resonates is detected by a receiver (usually contained within a tower adjacent to the transmitter tower), which is programmed to recognize a wide range of frequencies.  By detecting a phase difference between the transmitter signal and the label or tag signal, the receiver recognizes the presence of the label or tag, and sounds an alarm.

18.     AM EAS systems use a transmitter and a receiver, each contained within a single security tower that flank store exits in pairs, to create a surveillance area or "interrogation zone" where tags and labels are detected.  The transmitter in one tower sends a radio frequency signal at a frequency of 58 kHz (thousands of cycles per second), with the frequency sent in pulses.  The transmit signal energizes an AM label or tag that enters within the interrogation zone.  When the transmit signal pulse ends, the AM label or tag responds, emitting a single frequency signal like a tuning fork.  The label or tag signal is at the same frequency as the transmitter signal.  While the transmitter is off between pulses, a receiver, contained within the other tower in the pair, detects the label or tag signal.  A microcomputer checks the label signal detected by the receiver to ensure that the label signal is at the appropriate frequency, occurs in

time synchronized to the transmitter, at the proper level, and at the correct repetition rate.  If these criteria are met, an alarm will sound.

19.     The AM tag or label contains two elements within a *three dimensional plastic housing* consisting of amorphous resonator material with magnetic properties and a bias magnetic strip.  When aligned on top of the magnet, the amorphous material vibrates at a defined frequency.  Because AM technology depends on this amorphous resonator material and bias magnetic strip encased within a three dimensional plastic housing to function, AM labels *cannot* be flat and are much thicker than RF labels.  Indeed, AM labels are *more than nine times as thick* as RF labels, resembling a large piece of chewing gum.

20.     From both a supply-side and a demand-side perspective, AM technology cannot be substituted for RF technology in the sale of EAS systems to food and drug retailers.  First, because of the differences in technology between RF and AM technologies, EAS system suppliers do not – and indeed cannot – offer AM flat labels.

21.     In addition, on the demand side, because food and drug retailers strongly prefer flat labels and AM EAS labels cannot be flat, these retailers overwhelmingly demand RF EAS technology.  Moreover, food and drug retailers' strong preference for RF labels drives them to purchase RF EAS systems, including RF towers, tags, deactivators, and other related EAS security equipment as well.  It would be impractical in most instances for food and drug retailers to purchase an AM EAS system, because nearly all such customers demand flat labels for at least some of their products and AM EAS systems do not allow for the use of flat labels.  It would also be impractical and costly for food and drug retailers to maintain both an RF EAS system and an AM EAS system.  As outlined in detail below, RF EAS systems and AM EAS systems are not interoperable with one another.  As a result, food and drug retailers' overwhelming preference for flat labels, which by definition are RF, causes them to outfit their entire store with RF technology, including but not limited to towers, tags, deactivators, and other EAS security equipment.

22.     Indeed, USS sells both RF and AM EAS tags and labels and is not aware of a single national drug retail chain customer – and is aware of only a few national food retail

1   chain customers – that deploy AM EAS technology.  Because of these customers' unique

2   demands for flat labels, they overwhelmingly demand RF EAS towers, tags, labels,

3   deactivators and other RF EAS security equipment.

4       23.     As a result of both the supply-side and demand-side factors, EAS systems for

5   food and drug customers are dominated by RF technology, which, in turn, is dominated by

6   Checkpoint.

7                     **VI. Relevant Markets and Market Power**

8       24.     The relevant market in which to assess the anticompetitive effects of Defendant's

9   conduct is the market for EAS systems sold to food and drug retailers.

10      25.     In the alternative, the relevant markets in which to assess the anticompetitive

11  effects of Defendant's conduct are the separate markets for (1) EAS security towers, (2) EAS

12  security labels, (3) EAS security tags, and (4) EAS deactivators, sold to food and drug retailers.

13      26.     The relevant market for EAS systems sold to food and drug retailers does not

14  include AM EAS systems for several reasons, including the following:

15      27.     First, and most importantly, as discussed above, AM EAS systems are *not* a viable

16  alternative for food and drug retailers.  For many small consumer products sold by food and

17  drug retailers, it would be impractical to attach a hard tag that is larger than the merchandise

18  itself, or a thick AM label rather than a flat label to the merchandise.   An AM label, which is

19  not and cannot be flat, may cause the product to tip over if, for example, the label is placed on

20  the bottom of the product.  Similarly, pressure from items stacked adjacent to or on top of the

21  item could cause a non-flat label to deactivate.  Also, it is more difficult to affix non-flat labels

22  to items with curved packaging, as paper adhesive flat labels are more flexible than

23  corresponding non-flat labels housed within a three dimensional plastic casing.  Finally, with

24  limited shelf space, retailers want security labels that take the least amount of space possible.

25  As such, there is an extremely strong preference among food and drug retailers for flat labels.

26      28.     Because food and drug retailers require flat labels, they overwhelmingly purchase

27  RF EAS systems, including RF towers, tags, labels, deactivators, and other EAS security

28  equipment.  RF EAS systems are not interoperable with AM EAS systems.  RF tags, labels,

and deactivators do not work with AM towers, and AM tags, labels and deactivators do not work with RF towers.  As a result, because food and drug retailers demand RF EAS labels, they must also purchase RF towers, tags, deactivators, and other EAS security equipment to ensure that the components of their article surveillance security system work together.

29.     In addition to the fact that AM is not an adequate alternative from a functional standpoint, a customer's initial decision to purchase RF EAS technology strongly incentivizes that customer to continue purchasing RF technology going forward.  For example, a customer cannot replace a defective or out-of-date RF EAS tower with an AM EAS tower unless the customer spends a prohibitive amount of money to retrofit the entire customer-establishment with AM technology, including but not limited to replacing its RF security tags, labels, and deactivators with AM security tags, labels, and deactivators.  Changing between RF and AM technologies could cost an establishment a substantial and prohibitive amount of money.

30.     Third, there are substantial price differences between RF EAS towers and AM EAS towers, with RF EAS towers priced significantly lower than AM EAS towers.

31.     As such, AM technology is not an adequate substitute for RF technology in the sale of EAS systems to food and drug retailers.

32.     A small but significant non-transitory increase in price of RF EAS systems will not result in food and drug customers switching to AM EAS systems.

33.      Upon information and belief, Checkpoint dominates the market for EAS systems sold to food and drug retailers with at least 80% of the market.

34.     There are substantial barriers to entry in the market for EAS systems sold to food and drug retailers.  For example, potential new entrants wishing to successfully enter into the RF EAS systems market would face costs in the tens of millions of dollars, including, but not limited to, expenditures on research and development, manufacturing plants and equipment, and sales and marketing.

35.     Moreover, as described in more detail below, Checkpoint's exclusionary conduct has substantially increased the entry barriers in this market.  Checkpoint's exclusive contracts, which foreclose a substantial majority of the market, and bundled discounting have made it

nearly impossible for USS and other actual or potential competitors to gain any traction in the market for EAS systems sold to food and drug retailers.

36.     In the alternative, the relevant markets in which to assess the anticompetitive effects of Defendant's conduct are the separate product markets of EAS security system components sold to food and drug retailers, including but not limited to:  (1) EAS security towers, (2) EAS security labels, (3) EAS security tags, and (4) EAS deactivators.

37.     For the same reasons discussed in paragraphs 26 to 35, the relevant market for EAS security towers sold to food and drug retailers does not include AM security towers.

38.     For the same reasons discussed in paragraphs 26 to 35, the relevant market for EAS security labels sold to food and drug retailers does not include AM security labels.

39.     For the same reasons discussed in paragraphs 26 to 35, the relevant market for EAS security tags sold to food and drug retailers does not include AM security tags.

40.      For the same reasons discussed in paragraphs 26 to 35, the relevant market for EAS security deactivators sold to food and drug retailers does not include AM security deactivators.

41.     The relevant geographic market in which to assess the anticompetitive effects of Defendant's conduct is the United States.

42.     Food and drug retailers in the United States purchase the vast majority of their EAS security system requirements, including EAS security towers, labels, tags, deactivators, and other EAS security equipment from suppliers located in the United States.

43.     A small but significant non-transitory increase in price of EAS security systems will not result in food and drug retailers turning to alternative sources of supply located outside the United States for their EAS system requirements.

44.     For several reasons, foreign suppliers of EAS security systems are neither practical nor timely alternatives for food and drug retailers in the United States.  These reasons include, but are not limited to (1) shipping costs and distribution limitations; (2) regulatory barriers to entry, including all relevant FCC regulations governing the use of Radio-Frequency technology; (3) technological barriers to entry, including technological differences in EAS

1  systems used by food and drug retailers located in the United States vis-à-vis those used by

2  food and drug retailers located abroad; (4) practical barriers to entry, including a foreign

3  suppliers' diminished ability, particularly in the short-term, to provide on-the-ground servicing,

4  repair, maintenance, customization, and ongoing customer support for EAS systems used by

5  food and drug retailers located in the United States; (5) artificially created barriers to entry as a

6  result of Checkpoint's anticompetitive conduct, including but not limited to Checkpoint's

7  multi-year exclusive contracts and anticompetitive bundling practices, which have the effect of

8  excluding USS, as well as other potential suppliers of EAS systems, from competing for sales

9  to food and drug retailers located in the United States; and (6) other commercial realities that

10  make it impractical for food and drug retailers located in the United States to purchase EAS

11  systems from foreign suppliers.

12  **VII. Anticompetitive and Exclusionary Conduct**

13  45.  Checkpoint has dominated the market for EAS systems sold to food and drug

14  retailers for nearly forty years.  Checkpoint has strengthened and maintained its hold on the

15  market for EAS systems sold to food and drug retailers, not through competition on the merits

16  – *e.g.*, by being a more efficient supplier or by offering superior products – but instead by

17  engaging in anticompetitive conduct.  Checkpoint's share of this market is enormous, with at

18  least 80% of the market.

19  Checkpoint identifies USS as a significant competitive threat

20  46.  In 2006, Checkpoint recognized USS as an increasingly threatening competitor

21  and set out to suppress competition from USS by proposing an agreement whereby Checkpoint

22  *could* (but did not have to) distribute USS products.  In exchange, USS *would* be prohibited

23  from soliciting or selling to Checkpoint's customers, which represented a significant portion of

24  the top customers in the market.

25  47.  More specifically, in 2006, Checkpoint approached USS and requested to become

26  a distributor of USS's products.  In good faith, USS began discussions with Checkpoint about

27  entering a distribution agreement.   The distribution agreement proposed by Checkpoint,

28  however, put USS in an untenable position.  The proposed agreement included a "Non-

1  Competition" provision that prohibited USS from selling to, marketing to, or soliciting

2  Checkpoint's current customers during the two-year term of the agreement and for an

3  additional ninety days following the termination of the agreement.  Thus, USS would be

4  foreclosed from competing for a substantial number of top customers while Checkpoint could,

5  but would have no obligation, to resell USS products.  At that point, USS recognized

6  Checkpoint's proposed distribution agreement as nothing more than an attempt to foreclose

7  competition from USS and declined to engage in further discussions with Checkpoint.

8      Unable to enter an agreement with USS, Checkpoint resorts to anticompetitive conduct

9      48.    Undeterred by its failed attempt to exclude USS through an anticompetitive non-

10  compete provision in the proposed distribution agreement, Checkpoint instead sought to stifle

11  competition from USS by exploiting its dominance in the market for EAS systems sold to food

12  and drug retailers.

13      Checkpoint's efforts to exclude USS through exclusive dealing

14      49.    First, Checkpoint sought to enhance and maintain its monopoly power in the

15  market for EAS systems sold to food and drug retailers by entering into long-term exclusive

16  agreements – approximately 3-5 years in duration – with a *substantial majority* of food and

17  drug retail customers.  Through its exclusive agreements, Checkpoint has (1) prohibited

18  customers from purchasing EAS products from any supplier other than Checkpoint, and/or (2)

19  conditioned large discounts on exclusivity, coercing customers to maximize their discounts by

20  dealing exclusively with – or almost exclusively with – the dominant market player.

21      50.    The intent and effect of these long-term exclusive agreements is to foreclose USS,

22  and other potential Checkpoint competitors, from a substantial share of the market for EAS

23  systems.  In fact, USS estimates that, as a result of Checkpoint's exclusive dealing

24  arrangements, it is foreclosed from a vast *majority* of the market for EAS systems sold to food

25  and drug retailers.  Thus, as a direct consequence of these exclusive agreements, customers are

26  denied the opportunity to choose less expensive and more innovative EAS systems products

27  supplied by USS and its competitors, and face the real possibility that competition to

28  Checkpoint in these markets will soon be eliminated altogether.

<u>Checkpoint's efforts to exclude USS by raising USS's costs through bundled discounts</u>

51.     Second, Checkpoint has engaged in a strategy to raise USS's costs in an effort to foreclose USS from the market for EAS systems sold to food and drug customers.

52.     On information and belief, Checkpoint bundles together its EAS security towers, labels, tags, deactivators, and other EAS security equipment and offers a sharp discount on its towers and deactivators if the customer also commits to purchasing EAS tags, labels, and other RF EAS security equipment from Checkpoint.

53.     On information and belief, food and drug retailers agree to purchase this bundle – and constrain their ability to purchase various security components from other RF EAS suppliers – not because they prefer or must have only one supplier of RF EAS system products, but because Checkpoint provides a sharp upfront discount on RF EAS towers and deactivators and *requires* this exclusivity.  USS's and other competitors' RF EAS labels, tags, deactivators and other EAS security equipment products are interoperable and work equally well with Checkpoint's RF EAS towers.  On information and belief, food and drug customers would prefer to (but cannot) purchase individual component products for their EAS security systems from the supplier or suppliers of their choice due to Checkpoint's exclusivity requirements.

54.     Because Checkpoint's competitors cannot offer a comparable multi-product discount – as they either do not sell EAS towers or have been unable to gain any traction in this market as a result of Checkpoint's exclusive agreements – they are unable to compete with Checkpoint's bundle even though these competitors are more efficient producers of EAS labels, tags, deactivators, and other RF EAS security equipment.  For example, because of its anticompetitive conduct, Checkpoint dominates the market for sales of EAS systems, including all component products sold as part of the system, to food and drug customers, despite the fact that USS prices its EAS labels approximately 40-50% lower than Checkpoint's labels.

55.     Indeed, this is precisely Checkpoint's strategy.  On information and belief, Checkpoint sells its dominant tower product at such a severe discount – or, in many cases, gives this product away for free – if and only if a customer also commits to purchasing EAS tags, labels, deactivators, and other EAS security equipment from Checkpoint.  In other words,

Checkpoint is willing to incur a loss on its sales of EAS towers in order to lock-down customers in the sales for EAS labels, tags, deactivators, and other EAS security equipment thereby excluding, and ultimately eliminating, potentially threatening competitors, such as U.S.S and potential new entrants.

56.     As a result, Checkpoint raises the costs of its rivals, who in order to compete in selling RF EAS labels, tags, deactivators, and other EAS security equipment to food and drug retailers, must also offer EAS towers.  Food and drug retailers have not generally required that suppliers of EAS labels, tags, and deactivators also sell towers.  Furthermore, USS as well as other competitors and new entrants have little hope of selling EAS towers to food and drug retailers, since Checkpoint has foreclosed a substantial majority of the market through its exclusive dealing and anticompetitive bundled discounts.

57.     As a result of Checkpoint's bundled discounting, Checkpoint effectively raises the relative price of EAS systems sold to food and drug retailers by U.S.S and other competitors. For example, even though USS is a more efficient supplier of EAS labels, tags, deactivators, and other EAS security equipment, and offers equal or superior products, customers forego the purchase of these products from USS because purchasing *any* EAS component product from USS would strip them of their bundled discount from Checkpoint.

58.     Not only is Checkpoint clearly pricing its tower and deactivator products below any measure of cost – as it is giving away these products for nothing – but, on information and belief, it is pricing its EAS labels and tags below incremental cost when the full amount of the discount provided to the customer by giving towers and deactivators away for free is allocated to Checkpoint's sales of EAS labels, tags, and other EAS security equipment.  It is worthwhile for Checkpoint to engage in this strategy of below-cost pricing in the short-term because doing so will allow Checkpoint to eradicate all other competing suppliers of RF EAS towers, labels, tags,  deactivators and other EAS security equipment, with the ultimate goal of increasing prices to supracompetitive levels once free from competition.

59.     Furthermore, having driven out competition in the market for EAS systems sold to food and drug retailers, Checkpoint's exclusive contracts, coupled with substantial existing

barriers to entry, including necessary expenditures on research and development, manufacturing plants and equipment, and sales and marketing, will eliminate the threat of new market entrants.

60.     As a result, not only is Checkpoint's conduct excluding a more efficient supplier of EAS systems, but food and drug retailers run the serious risk that Checkpoint will soon face no competition whatsoever in the markets for EAS towers, labels, tags, deactivators, and other EAS security equipment and, therefore, have the ability to price its EAS systems at exorbitant levels.

<u>Checkpoint's efforts to disparage USS through false and/or misleading misrepresentations</u>

61.     Third, Checkpoint has sought to disparage USS in the marketplace by making false representations about USS while promoting Checkpoint products to customers with the intent and effect of dissuading retailers from purchasing EAS systems from USS  Upon information and belief, Checkpoint has told customers that USS is nothing more than a reseller of Chinese products.  For example, in 2009, Checkpoint sent a chart to customers comparing Checkpoint's and USS's products and labeling Checkpoint as an "innovator," while stating that USS is merely a "reseller" of products designed and manufactured by Century, a Chinese manufacturer.  In one instance, an email from a Checkpoint employee states, "I promised to forward some examples to show that USS are merely a distributor of Century products, not an innovator, not a manufacturer as they lead us (me previously included) to believe.  Attached is a simple document to demonstrate this fact with comparison to Alpha's [acquired by Checkpoint in 2007] solutions which were designed and patented by Alpha."

62.     Furthermore, Checkpoint's own proposed distributorship agreement with USS stated that, "[USS] is engaged in the design, manufacture, sales and distribution of EAS Article Security Tags and reusable products" and thereby contradicts statements made by Checkpoint and its employees claiming that USS is merely a distributor of Century products.

63.     As a result of Checkpoint's intentional misrepresentations, a substantial number of customers were confused and deceived about USS's products.  A substantial number of

customers wrongly have believed that USS does not develop its own products, but that the Company merely resells the products of a Chinese manufacturer.

64.     This customer confusion and misinformation caused a substantial number of customers not to purchase USS products, although USS products were of the same or better quality and priced lower than Checkpoint's products.  As a result of Checkpoints intentional false statements and misrepresentations, USS believes that it has lost business from several major retailers.

65.     While it is impossible to know at this time what other false statements, either written or verbal, Checkpoint has made to customers in addition to the statements discussed in paragraph 61, on information and belief, USS believes that Checkpoint has engaged in a similar campaign of false statements to other customers of EAS systems, including but not limited to customers of EAS systems operating within the food and drug retail market.  Given that (1) at this time, it is impossible to ascertain the full extent and effect of Checkpoint's campaign of false statements to customers regarding USS's products (and the development and distribution of these products), and (2) in a relationship-driven business, false statements regarding the source and integrity of USS's products can cause substantial and irreparable damage to USS, it is difficult and costly for USS to counter Checkpoint's false, material statements in the marketplace.

66.     Moreover, Checkpoint's false statements – regarding USS as a mere reseller of products designed and developed by Century (as opposed to USS) – are material to, and likely to induce reasonable reliance by, the customers to whom these false statements were made. Indeed, on information and belief, these statements have, in fact, caused a substantial number of customers to refrain from purchasing from USS, or at least decrease the amount of their EAS system requirements purchased from USS.  Without knowledge of the fact that USS (not Century) develops and designs USS's EAS security systems, even large retail business are likely to be deceived by Checkpoint's campaign of false, material statements.

<u>Checkpoint's misappropriation of USS's trade secrets and efforts to interfere with non-disclosure</u>

<u>agreements of former USS employees</u>

67.     Checkpoint has wrongfully induced at least three former USS employees to violate the terms of confidentiality agreements and disclose trade secrets to Checkpoint. Checkpoint has engaged in unfair methods of competition by using USS's trade secrets, including their customer lists and pricing information, to solicit USS customers.

68.     USS requires each of its employees to execute a "Universal Employee Confidentiality Agreement" acknowledging that the "names and addresses of Universal's customers constitute trade secrets of Universal and that the sale or unauthorized use or disclosure of any of Universal's trade secrets obtained by Employee during his/her employment with Universal constitute unfair competition."  The agreement stipulates:

>    (a)     An employee will not disclose "Proprietary Information," including "customers and supplier lists, and contact at or knowledge of customers or prospective customers of Universal…either during or after his/her employment with Universal;" and

>    (b)     For a period of one year after the termination or cessation of employment, a former employee will not "make known to any person, firm, or corporation the names or addresses of any of the customers of Universal or any other information pertaining to them, or call on, solicit, take away, or attempt to call on, solicit, or take away any of the customers of Universal" whom the employee came to know through his or her employment at USS.

69.     In 2010, as part of its systematic campaign to eliminate USS as a competitor, Checkpoint hired at least three USS employees – representing 30% of USS's sales force – consisting of two national account managers as well as USS's vice president of sales. Checkpoint was aware that these employees possessed confidential information and trade secrets regarding USS's customers, prices, and products and intended to use this information to pursue customer accounts then held by USS.

70.     With actual and/or constructive knowledge that the former employees had entered into non-disclosure and non-compete agreements with USS, Checkpoint induced the breach of USS's "Universal Employee Confidentiality Agreement" by soliciting confidential information regarding USS's customers from these former employees and/or directing them to solicit customers away from USS through the use of such confidential information.   Upon information and belief, the former employees disclosed USS's trade secrets to Checkpoint, without USS's express or implied consent, despite the fact that they knew or had reason to know, at the time they disclosed the trade secrets, that their knowledge of the trade secrets had been acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

71.     Upon information and belief, the former employees used USS's trade secrets for their own benefit and for the benefit of Checkpoint, without USS's express or implied consent, despite the fact that they knew or had reason to know, at the time they used the trade secrets, that their knowledge of the trade secrets had been acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

72.     Upon information and belief, Checkpoint acquired USS's trade secrets despite the fact that it knew or had reason to know that the trade secrets were acquired by improper means and, still further, Checkpoint used USS's trade secrets for its own benefit, without USS's express or implied consent, despite the fact that Checkpoint knew or had reason to know, at the time it used the trade secrets, that its knowledge of the trade secrets was derived from or through USS's former employees, each of whom owed a duty to USS to maintain the trade secrets' secrecy or limit their use.

73.     Checkpoint engaged in these activities despite concerns raised by the former employees regarding their non-compete and confidentiality agreements with USS and the potential ramifications of their breach.  Indeed, in at least one instance, the former employee explained to USS that Checkpoint had offered to furnish legal counsel in the event that this individual was sued for breach of his confidentiality agreement.  But for Checkpoint's inducement and assurances, USS's former employees would not have disclosed trade secrets

1    regarding USS's confidential customer information or otherwise acted to take customers away

2    from USS in violation of the Universal Employee Confidentiality Agreement.

3         74.    Following Checkpoint's interference with the contractual relationship between

4    USS and its former employees, USS lost several major accounts, and continues to suffer lost

5    sales revenue from numerous other customers.

6              <u>Checkpoint's efforts to interfere with USS's business relationships</u>

7         75.    Finally, Checkpoint has wrongfully interfered with USS's customer contracts and

8    business relationships.  For example, in 2009, Checkpoint interfered with a contract between

9    USS and a large national retail chain for the sale of USS's Hawkeye tag product.  Despite the

10   fact that the customer had already placed an order to purchase 100,000 Hawkeye tags from

11   USS, Checkpoint induced that customer to cancel its order with USS and instead purchase a

12   "like" product from Checkpoint.  Checkpoint told the customer that – based on the parties'

13   exclusive contract – Checkpoint had the right to sell the customer any "like" product to the

14   Hawkeye tag and that the customer was prohibited from purchasing this product from USS.

15   Checkpoint, however, did not offer a "like" product to the Hawkeye tag, but instead sought to

16   purchase this tag from USS's exclusive manufacturer of the Hawkeye tag.  USS exclusive

17   manufacturer refused, explaining to Checkpoint that the Hawkeye tag was an exclusive USS

18   product for which USS had a pending patent.  Despite Checkpoint's inability to provide the

19   Hawkeye tag at that time, USS lost the order.

20        76.    As a result of Checkpoint's wrongful interference with USS's business

21   relationship and confirmed order for the sale of 100,000 Hawkeye tags to a large national retail

22   chain, USS was damaged in an amount to be determined at trial and cannot now be adequately

23   quantified before relevant discovery, but which, upon information and belief, exceeds millions

24   of dollars.

25              **VIII. Anticompetitive Effects of Checkpoint's Conduct**

26        77.    Checkpoint's anticompetitive, exclusionary conduct has resulted in injury to USS

27   as well as injury to competition.

28

78.     USS is an innovative, low-cost supplier of EAS systems sold to food and drug retailers.  The company has a history of introducing a broad-based line of security tags and labels from which its retail customers can choose, all designed to meet the specific needs of the retail establishment in general, as well as the particular product lines sold within that establishment.

79.     Studies comparing USS and Checkpoint products have concluded that USS's products are of equal or better quality compared to Checkpoint's products.  For example, a 2007 study conducted by the University of Southern California found that while both USS's Box Guard RF and AM EAS tags and Alpha's Spider RF and AM EAS tags [acquired by Checkpoint in November 2007] secured merchandise well, on average, the Box Guard could be attached 38% faster than the Spider, and detached 32% faster.  Inefficient attachment and detachment is more costly for retailers because tags must be attached to merchandise prior to putting them on the shelves and removed at checkout after purchase.  In addition, recent studies conducted by students at Harvey Mudd College similarly found the USS's Pinless Tag, Mini Box Guard, Milli Lanyard and Milli Tag products had faster attachment and detachment times than comparable EAS products.

80.     Moreover, USS is a low-cost supplier of EAS labels, tags, deactivators, and other EAS security equipment for food and drug retailers, pricing these products at substantial discounts to comparable products produced by Checkpoint.

81.     Despite supplying low-cost, innovative EAS systems, Checkpoint's exclusionary dealing and bundled discounting have had the effect of raising the costs of USS and other EAS label, tag and deactivator suppliers, marginalizing USS as a competitor, and preventing USS from effectively competing in the markets for EAS towers, tags, labels deactivators, and other EAS security equipment for food and drug retailers.  For example, in 2010, USS attempted to enter the EAS tower market for food and drug customers, but has been unable to gain any traction in this market due to Checkpoint's anticompetitive, exclusionary conduct.  USS has secured very few customers in the EAS tower market and may soon be forced to abandon its efforts if Checkpoint continues to foreclose a substantial majority of the market through long-

term exclusive agreements and bundled discounts designed to eliminate USS and other potential competitors from the market.  As a result of Checkpoint's exclusionary conduct, USS estimates that it is foreclosed from at least 80% of the market for EAS systems sold to food and drug retailers.

82.     Food and drug retailers are foregoing purchases of USS's innovative and low-cost line of EAS systems products not because of concerns over quality or because they believe Checkpoint's products are superior.  Instead, they are choosing Checkpoint because they are coerced to do so as a result of Checkpoint's insistence on long-term exclusive agreements and bundling of its dominant EAS tower product with its EAS label, tag, deactivator, and other EAS security equipment products.

83.     As a direct and proximate result of Checkpoint's exclusionary conduct, USS has been injured in an amount that cannot now be quantified, but which, upon information and belief, exceeds tens of millions of dollars.

84.     Moreover, Checkpoint's anticompetitive conduct has injured competition in the market for EAS systems sold to food and drug retailers.  Because Checkpoint has engaged in anticompetitive exclusive dealing and bundled discounting, food and drug retailers have been deprived of the option to choose USS, a more efficient supplier of equal or superior quality EAS products, or other competitors for their EAS requirements.  Neither USS nor Checkpoint's other actual or potential competitors can offer a comparable multi-product discount – as they either do not sell RF EAS towers or have been unable to gain any traction in this market as a result of Checkpoint's exclusive agreements.

85.     In addition, Checkpoint's actions have increased the barriers to entry, increased rivals costs, and depressed output, by reducing the range of alternatives among EAS systems available to food and drug retail customers, including higher-quality and innovative options offered by USS.  Through its exclusionary tactics, Checkpoint has denied food and drug customers the opportunity to choose alternatives to Checkpoint's dominant RF EAS systems.

86.     Checkpoint's conduct also has denied food and drug retail customers the opportunity to choose less expensive RF EAS towers, tags, labels, deactivators, and other EAS

security equipment options offered by more efficient competitors, including USS. Upon information and belief, Checkpoint's RF EAS systems components are more expensive than those offered by its competitors. Only by engaging in bundled discounting and exclusive dealing does Checkpoint continue to maintain its monopoly in EAS systems sold to food and drug retailers.

87.     Furthermore, Checkpoint's anticompetitive conduct and predatory discounting scheme threatens to drive out all other competing suppliers of EAS towers, labels, tags, deactivators, and other EAS security equipment sold to food and drug customers as well as potential entrants into this market. Checkpoint will then be able to increase prices for RF towers, labels, tags deactivators, and other EAS security equipment sold to food and drug customers to supracompetitive levels once free from competitive constraints.

88.     Finally, Checkpoint's conduct has affected and, unless enjoined, will continue to affect interstate commerce. These effects include, without limitation: (1) reduction of consumer choice among competing EAS systems sold to food and drug retailers; (2) elimination of the ability of competing EAS system manufacturers that sell to food and drug retailers to offer alternatives to Checkpoint's products; and (3) increased barriers to entry in EAS systems sold to food and drug retailers.

### IX. Claims for Relief

*Count I*

*Violation of Sherman Act § 1: Contract in Restraint of Trade*

89.     USS realleges and incorporates paragraphs 1 through 88 by reference.

90.     Checkpoint has entered agreements that constitute a contract, combination, or conspiracy in restraint of trade in the relevant market of EAS systems sold to food and drug retailers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

91.     For the purpose of excluding competition, Checkpoint entered into long-term exclusive contracts that prohibit food and drug customers from dealing with competing suppliers of EAS systems in an effort to exclude, and ultimately eliminate, competition from more efficient suppliers of superior EAS system products, such as USS.

92.     Checkpoint has excluded competitors, including USS, from the relevant market for EAS systems sold to food and drug retailers and has deprived consumers of the benefits of competition among suppliers of EAS systems.

93.     Checkpoint does not have a legitimate business purpose for its conduct.  Any claimed pro-competitive benefit is outweighed by the anticompetitive harm caused by that conduct.  Checkpoint's unlawful exclusive contracts have injured competition and consumers in the relevant market for EAS systems sold to food and drug retailers, suppressed sales of USS's products and the products of other competitors, diminished USS's future sales opportunities and the sales opportunities of other competitors, and increased USS's operating costs and the operating costs of other competitors.

*Count II*

*Violation of Sherman Act § 2: Unlawful Monopolization*

94.     USS realleges and incorporates paragraphs 1 through 88 by reference.

95.     Checkpoint's conduct constitutes the intentional and unlawful maintenance of monopoly power in the relevant market of EAS systems sold to food and drug retailers, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

96.     For the purpose of maintaining its monopoly power, Checkpoint committed numerous acts, including:

(a)     Foreclosing a substantial share of the relevant market(s) for EAS systems sold to food and drug retailers by entering into long-term exclusive contracts that prohibit customers from dealing with competing suppliers of EAS systems in an effort to exclude, and ultimately eliminate, competition from more efficient suppliers of equal or superior EAS products, such as USS;

(b)     Bundling its EAS tower product sold to food and drug retailers (in which it has a monopoly) with its EAS label, tag, deactivator, and other EAS security equipment products in an effort to exclude, and ultimately eliminate, competition from more efficient suppliers of equal or superior

-22-

quality EAS labels, tags, deactivators, and other EAS security equipment to food and drug retailers, such as USS;

(c)     Pricing its EAS systems bundle sold to food and drug retailers below cost in an effort to exclude, and ultimately eliminate, competition from more efficient suppliers of equal or superior EAS labels, tags, deactivators, and other EAS security equipment to food and drug retailers, such as USS; and

(d)     Making false, material statements to customers, that are likely to induce reasonable reliance, stating that USS is merely a distributor as opposed to the designer and developer of its EAS systems in an effort to exclude, and ultimately eliminate, competition from more efficient suppliers of equal or superior EAS labels, tags, deactivators, and other EAS security equipment to food and drug retailers, such as USS.

97.     Checkpoint has excluded competitors, including USS, from the relevant market for EAS systems and has deprived consumers of the benefits of competition among suppliers of EAS systems.

98.     Checkpoint does not have a legitimate business purpose for its conduct.  Any claimed pro-competitive benefit is outweighed by the anticompetitive harm caused by that conduct.

99.     Checkpoint's unlawful monopolization has injured competition and consumers in the relevant market for EAS systems sold to food and drug retailers, suppressed sales of USS's products and the products of other competitors, diminished USS's future sales opportunities and the sales opportunities of other competitors, and increased USS's operating costs and the operating costs of other competitors.

*Count III*

*Violation of Sherman Act § 2: Attempted Monopolization*

100.     USS realleges and incorporates paragraphs 1 through 88 by reference.

101.     Checkpoint acted with a specific intent to monopolize and to destroy competition in the market for EAS systems sold to food and drug retailers.  Checkpoint devised and

-23-

implemented a plan to systematically eliminate competition in the market for EAS systems sold to food and drug retailers.

102.    Checkpoint willfully engaged in a course of exclusionary conduct in order to obtain a monopoly in the market for EAS systems sold to food and drug retailers, including:

(a)    Foreclosing a substantial share of the relevant market(s) for EAS systems sold to food and drug retailers by entering into long-term exclusive contracts that prohibit customers from dealing with competing suppliers of EAS systems in an effort to exclude, and ultimately eliminate, competition from more efficient suppliers of equal or superior EAS products, such as USS;

(b)    Bundling its EAS tower product sold to food and drug retailers (in which it has a monopoly) with its EAS label, tag, deactivator, and other EAS security equipment products in an effort to exclude, and ultimately eliminate, competition from more efficient suppliers of equal or superior EAS labels, tags, deactivators, and other EAS security equipment to food and drug retailers, such as USS;

(c)    Pricing its EAS systems bundle sold to food and drug retailers below cost in an effort to exclude, and ultimately eliminate, competition from more efficient suppliers of equal or superior EAS labels, tags, deactivators, and other EAS security equipment to food and drug retailers, such as USS; and

(d)    Making false, material statements to customers, that are likely to induce reasonable reliance, stating that USS is merely a distributor as opposed to the designer and developer of its EAS systems in an effort to exclude, and ultimately eliminate, competition from more efficient suppliers of equal or superior EAS labels, tags, deactivators, and other EAS security equipment to food and drug retailers, such as USS.

103.   Checkpoint does not have a legitimate business purpose for its conduct. Any claimed pro-competitive benefit is outweighed by the anticompetitive harm caused by that conduct.

104.   At the time Checkpoint engaged in this exclusionary conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling the market for EAS systems sold to food and drug retailers and excluding its competitors.

105.   Checkpoint's unlawful attempts to destroy competition in the market for EAS systems sold to food and drug retailers have injured competition and consumers in the market for EAS systems, suppressed sales of USS's products and the products of other competitors and diminished USS's future sales opportunities and the sales opportunities of other competitors, and increased USS's operating costs and the operating costs of other competitors.

*Count IV*

*Violation of Clayton Act § 3: Unreasonable Restraint of Trade*

106.   USS realleges and incorporates paragraphs 1 through 88 by reference.

107.   Checkpoint has entered into agreements with food and drug retailers for the sale of EAS systems pursuant to which Checkpoint has conditioned the availability of discounts on the requirement that the retailers refrain from purchasing competing products, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

108.   The effect of these arrangements has been to substantially lessen competition in the market for EAS systems sold to food and drug retailers.

109.   As a direct and proximate result of Checkpoint's anticompetitive conduct, USS has suffered damages through diminished sales and diminished future sales opportunities.

110.   There is no legitimate business justification for Checkpoint's anticompetitive conduct. To the extent that Checkpoint has sought to achieve any legitimate business purpose through its conduct, it has not used the least restrictive means of doing so. Moreover, any claimed pro-competitive benefit is outweighed by the anticompetitive harm caused by Checkpoint's conduct.

*Count V*

*Violation of Lanham Act § 43(a)*

111.　USS realleges and incorporates paragraphs 1 through 88 by reference.

112.　Checkpoint has made false and misleading representations of fact in interstate commerce and in connection with goods or services in commercial advertising or promotion in violation of the Lanham Act, 15 U.S.C. § 1125.　By misinforming customers that USS is merely a distributor as opposed to the designer and developer of its EAS systems, Checkpoint has misrepresented the nature, characteristics, and qualities of USS's goods and services.　USS has been and will likely continue to be damaged by these acts.

113.　Checkpoint's false and misleading representations, made when promoting Checkpoint's products to customers, actually have confused and deceived, and have had the tendency to confuse and deceive, a substantial number of retailer-consumers concerning the characteristics of products and services sold by USS in interstate commerce.

114.　As a direct and proximate result of Checkpoint's misrepresentations, USS has lost sales, profits, and goodwill, and has suffered injury to its business reputation.　USS has been and will continue to be injured in its efforts to sell its products and services.　USS has sustained and will continue to sustain damages, the nature and extent of which cannot presently be determined.

*Count VI*

*Violation of the Valentine Act, Ohio Revised Code §§ 1331 et seq.*

115.　USS realleges and incorporates paragraphs 1 through 88 by reference.

116.　Checkpoint has entered agreements that constitute a contract, combination, or conspiracy in restraint of trade in the relevant market of EAS systems sold to food and drug retailers in violation of the Valentine Act, §§ 1331 *et seq.* of the Ohio Revised Code.

117.　For the purpose of excluding competition and maintaining its monopoly power, Checkpoint entered into long-term exclusive contracts that prohibit customers from dealing with competing suppliers of EAS systems in an effort to exclude, and ultimately eliminate, competition from more efficient suppliers of equal or superior EAS products, such as USS.

118.    Checkpoint has excluded competitors, including USS, from the relevant market for EAS systems sold to food and drug retailers and has deprived consumers of the benefits of competition among suppliers of EAS systems.

119.    Checkpoint does not have a legitimate business purpose for its conduct.  Any claimed pro-competitive benefit is outweighed by the anticompetitive harm caused by that conduct.  Checkpoint's unlawful exclusive contracts in restraint of trade and monopolization have injured competition and consumers in the relevant market(s) for EAS systems sold to food and drug retailers, suppressed sales of USS's products and the products of other competitors, diminished USS's future sales opportunities and the sales opportunities of other competitors, and increased USS's operating costs and the operating costs of other competitors.

*Count VII*

*Violation of Deceptive Trade Practices Act, Ohio Revised Code §§ 4165 et seq.*

120.    USS realleges and incorporates paragraphs 1 through 88 by reference.

121.    Checkpoint's deceptive and anticompetitive conduct constitutes a deceptive trade practice which violates §§ 4165 *et seq.* of the Ohio Revised Code.

122.    Specifically, Checkpoint, in the course of its business, has disparaged the goods, services, or business of another by false representation of fact.  Checkpoint's false representations of fact have actually confused and deceived, and have the tendency to confuse and deceive, a substantial number of retailer-consumers concerning the characteristics of products and services sold by USS.

123.    As a direct and proximate result of Checkpoint's anticompetitive conduct, USS has lost sales, profits, and goodwill.  USS has been and will continue to be injured in its efforts to sell its products and services.  USS has sustained and will continue to sustain damages, the nature and extent of which cannot presently be determined.

*Count VIII*

*Tortious Interference with Contract*

124.    USS realleges and incorporates paragraphs 1 through 88 by reference.

125.    USS entered into valid contracts with its employees prohibiting the disclosure of certain trade secrets and confidential business information related to USS's customers. These contracts:

> (a)    Prohibit the employees from disclosing propriety information, including but not limited to, customer and supplier lists, and contact at or knowledge of customers or prospective customers of USS, either during or after the employees' employment at USS; and

> (b)    Prohibit the employees from disclosing the names, addresses or other information regarding any USS customers and soliciting or attempting to solicit away any USS customers on whom the employee called on or was acquainted with through employment at USS, while employed at USS and for one year after termination of employment.

126.    Checkpoint tortiously interfered with the aforementioned contractual relationships by hiring at least three former USS employees and inducing them to breach their contract by disclosing confidential information regarding USS's customers and/or acting directly to solicit customers away from USS.  Checkpoint did so with actual malice.

127.    Checkpoint induced former USS employees to breach their contracts with USS with full knowledge of the existence of the non-disclosure and confidentiality agreements and without privilege to do so.  USS's former employees expressed their concerns to Checkpoint regarding the confidentiality agreements and would not have breached their agreement with USS but for Checkpoint's inducement and interference.

128.    As a direct and proximate result of Checkpoint's tortious interference USS has been and will continue to be injured by the loss of several major customer accounts and a continued decline in sales to numerous other customers.  USS has sustained and will continue to sustain damages, the nature and extent of which cannot presently be determined.

*Count IX*

*Tortious Interference with Business Relationship*

129.    USS realleges and incorporates paragraphs 1 through 88 by reference.

130.    USS entered in to a business relationship in 2009 with a large national retail chain customer which included a valid order for the sale of 100,000 Hawkeye tags.

131.    With full knowledge and awareness of the aforementioned business relationship, Checkpoint acted intentionally to tortiously interfere with this relationship by inducing the customer to cancel its order with USS and instead purchase a "like" product from Checkpoint. Checkpoint told the customer that – based on the parties' exclusive contract – Checkpoint had the right to sell the customer any "like" product to the Hawkeye tag and that the customer was prohibited from purchasing this product from USS.  Checkpoint induced the customer to terminate their relationship with USS despite the fact that Checkpoint did not manufacture a "like" product to provide to the customer at that time.  Checkpoint did so with actual malice.

132.    As a result of Checkpoint's intentional and wrongful interference with USS's business relationship and confirmed order for the sale of 100,000 Hawkeye tags to a large national retail chain, USS was damaged in an amount to be determined at trial and cannot now be adequately quantified before relevant discovery, but which, upon information and belief, exceeds millions of dollars.

*Count X*

*Misappropriation of Trade Secrets, Ohio Rev. Code §§ 1333.61 et seq.*

133.    USS realleges and incorporates paragraphs 1 through 88 by reference.

134.    By, among other things, requiring its employees to sign confidentiality, non-disclosure and non-solicitation agreements, USS took reasonable efforts to maintain the secrecy of its trade secrets, including its customer lists and pricing information, which derived independent economic value from not being generally known to, and not being readily accessible by proper means by, other persons who could obtain economic value from their disclosure or use.  Therefore, such information constitutes trade secrets within the meaning of Ohio's Uniform Trade Secrets Act, Ohio Revised Code. §§ 1333.61, *et seq.*

135.    Upon information and belief, and as further described in paragraphs 67-73 above, Checkpoint has misappropriated USS's trade secrets in violation of  Ohio's Uniform Trade Secrets Act, Ohio Revised Code §§ 1333.61, *et seq.*

-29-

136.    Upon information and belief, Checkpoint's misappropriation of USS's trade secrets was willful and malicious.

137.    Checkpoint was unjustly enriched and personally benefitted from the misappropriation of USS's trade secrets.

138.    As a direct and proximate result of Checkpoint's unlawful conduct, USS has sustained compensatory damages.

139.    Because Checkpoint's misappropriation of USS's trade secrets was willful and malicious, USS is entitled to exemplary damages in an amount not exceeding three times any award of compensatory damages.

**PRAYER FOR RELIEF**

WHEREFORE, USS prays for judgment in its favor and against Checkpoint as follows:

1.    Adjudging and decreeing that Checkpoint engaged in unlawful anticompetitive conduct in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), Section 2 of the Sherman Act (15 U.S.C. § 2), Section 3 of the Clayton Act (15 U.S.C. § 14), the Lanham Act (15 U.S.C. § 1125), Ohio's Valentine Act (Ohio Rev. Code §§ 1331 *et seq.*), Ohio's Deceptive Trade Practices Act (Ohio Rev. Code §§ 4165 *et seq.*), Ohio's Trade Secrets Act, §§ 1333.61 *et seq.*, common law tortious interference with contract and common law tortious interference with business relationship;

(a)    An Order directing the termination of the alleged anticompetitive conduct and injunctive relief that restores USS to the same position it occupied prior to Checkpoint's unlawful exclusionary conduct;

(b)    Treble damages (including lost profits), in an amount to be determined at trial and cannot now be adequately quantified before relevant discovery, but which, upon information and belief, exceeds tens of millions of dollars;

(c)    USS's costs of suit herein, including their attorney's fees actually incurred;

(d)    Punitive damages;

-30-

1    (e)    Restitutionary relief; and

2    (f)    Such other relief as may be just and proper.

3

4                                        /s/ *Kip T. Bollin*

5                                        Kip T. Bollin (0065275)
                                         *kip.bollin@thompsonhine.com*
6                                        Michael P. Sherban (0079950)
                                         *mike.sherban@thompsonhine.com*
7                                        THOMPSON HINE LLP

8                                        3900 Key Center
                                         127 Public Square
9                                        Cleveland, OH  44114-1291
                                         Phone: (216) 566-5500
10                                       Fax: (216) 566-5800

11                                       OF COUNSEL:
                                         (*Pro Hac Vice Motions to be Filed*)
12

13                                       **WILSON SONSINI GOODRICH &
                                         ROSATI, P.C.**
14
                                         Scott A. Sher
15                                       Mark R. Rosman
                                         Jonathan R. Lutinski
16                                       1700 K Street, NW, Fifth Floor
                                         Washington, D.C. 20006-3817
17                                       Telephone:   (202) 973-8800
                                         Facsimile    (202) 973-8899
18                                       Emails: *ssher@wsgr.com*
                                                    *mrosman@wsgr.com*
19                                                   *jlutinski@wsgr.com*

20                                       **WILSON SONSINI GOODRICH &
                                         ROSATI, P.C.**
21
                                         Dylan J. Liddiard
22                                       650 Page Mill Road
                                         Palo Alto, CA 94304
23                                       Telephone: (650) 493-9300
                                         Facsimile: (650) 565-5100
24                                       Email: *dliddiard@wsgr.com*

25

26                                       *Counsel for Plaintiff Universal Surveillance
                                         Corporation*
27

28

## **REQUEST FOR TRIAL BY JURY**

1

2       Pursuant to Federal Rules of Civil Procedure, Rule 38(b), USS respectfully requests trial

3 by jury for all of the issues pled so triable.

4

5                                 /s/ *Kip T. Bollin*

6                                 Kip T. Bollin (0065275)
*kip.bollin@thompsonhine.com*

7 Michael Sherban (0079950)
*mike.sherban@thompsonhine.com*

8 THOMPSON HINE LLP
3900 Key Center

9 127 Public Square
Cleveland, OH  44114-1291

10 Phone: (216) 566-5500
Fax: (216) 566-5800

11

12 Counsel for Plaintiff Universal Surveillance Corporation

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28