# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNIVERSAL SURVEILLANCE CORP.** | : | |
| | : | **Case No. 5:11-CV-1755** |
| **v.** | : | |
| | : | |
| **CHECKPOINT SYSTEMS, INC.,** | : | **SPECIAL MASTER COHEN** |
| | : | |
| | : | **REPORT REGARDING** |
| | : | **PLAINTIFF'S MOTION TO** |
| | : | **PRECLUDE TESTIMONY** |
| | : | **OF DR. BARRY HARRIS AND** |
| | : | **DR. MICHAEL KEELEY** |
| | : | |
| | : | *FILED UNDER SEAL* |

Plaintiff Universal Surveillance Corporation d/b/a Universal Surveillance Systems ("USS") brings this action against defendant Checkpoint Systems, Inc., asserting Checkpoint engaged in unlawful, anticompetitive conduct in the sale of Electronic Article Surveillance systems.[1] The parties have submitted expert reports, and each side has moved to exclude opposing expert testimony.

This Report addresses USS's motion to preclude two of Checkpoint's rebuttal economics experts, Barry Harris and Michael Keeley, from testifying as to certain opinions (docket no. 306). The Special

---

[1] USS claims Checkpoint entered into agreements restraining trade in violation of Section 1 of the Sherman Act and Ohio Revised Code §§1331 *et seq*.; unlawfully monopolized and attempted to monopolize relevant markets in violation of Section 2 of the Sherman Act; and unreasonably restrained trade in violation of Section 3 of the Clayton Act. *See* second amended complaint, counts I-IV, VI (docket no. 139).

Master concludes most, but not all, of the challenged opinions are admissible.[2]  Accordingly, for the reasons and to the extent stated below, the Special Master **recommends the Court grant in part and deny in part USS's motion to exclude Harris's and Keeley's opinions.**

The deadlines related to filing of objections, if any, are set out in Section IV of this Report.

## I.     **Background**.

USS and Checkpoint are competitors in the business of selling Electronic Article Surveillance Systems ("EAS Systems").  EAS Systems, which are used to prevent theft in retail stores, typically include the following equipment: (1) security labels and tags that are attached to merchandise; (2) deactivators that neutralize the label or tag after the merchandise is paid for; and (3) security towers that signal if a still-active label or tag leaves the store.  Sellers of EAS Systems also typically provide support services, such as fixing security towers that malfunction.  EAS systems work using one of two different technologies: Radio-Frequency ("RF") or Acousto-Magnetic ("AM").

According to USS, there are two separate relevant markets in the United States in which to assess the anticompetitive effects of Checkpoint's alleged conduct: "(1) EAS systems sold to food and drug retail stores ('Food and Drug Market' or 'F&D Market') and (2) EAS systems sold to drug and pharmacy retail stores ('Drug and Pharmacy Market' or 'D&P Market')."  Second amended complaint at ¶24.  (USS asserts the Drug and Pharmacy Market is actually a submarket within the larger Food and Drug Market.)  USS contends Checkpoint engaged in illegal, anticompetitive conduct in both of these relevant markets

---

[2] Specifically, the Special Master concludes the Court should: (1) grant USS's motion to bar Harris and Keeley from offering opinions that (a) the *PeaceHealth* test is inapplicable, (b) the predatory pricing test should be used instead, or (c) the predatory pricing test shows Checkpoint has not engaged in anticompetitive conduct; and (2) otherwise deny USS's motion.

in two different ways.  First, USS claims Checkpoint entered into long-term, exclusive contracts with retailers in the relevant markets, and these contracts worked to prohibit the retailers from purchasing EAS products from Checkpoint's competitors.  Second, USS claims Checkpoint eliminated efficient competition in the relevant markets by "bundling" its EAS products – that is, selling security towers, tags, deactivators, and other EAS equipment as a package, with one or more of these products provided at a sharp discount (or even for free), in exchange for a customer's commitment to buy other EAS equipment.

USS retained an economics expert, Ramsey Shehadeh, to evaluate: (a) whether Checkpoint is a monopolist, (b) whether Checkpoint's conduct worked to maintain prices for EAS products at a monopoly level, and, (c) if so, the amount of economic damages Checkpoint owes to USS.  Shehadeh submitted an expert report detailing four principal conclusions, quoted below:

1.  The relevant antitrust markets for evaluating Checkpoint's conduct consist of (i) a market for RF-EAS equipment, (ii) a market for RF-EAS labels, and (iii) a market for RF-EAS tags (jointly referred to as RF-EAS systems in this report) to food and drug [F&D] retailers in the United States.  These retailers carry a high volume of health and beauty products and over-the-counter drugs and choose EAS based on factors that are identifiable by EAS retailers.

2.  Checkpoint was a monopolist, maintaining 99 percent of sales in the relevant markets from at least 2005 through 2011, and has engaged in anticompetitive conduct including anticompetitive bundling and exclusive contracting to exclude competition from the market.  These bundles satisfy the economic standard for identifying anticompetitive conduct under [*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008)].

3.  But for this anticompetitive conduct, prices for RF-EAS systems to food and drug retailers between 2004 and 2012 would have been about 8 percent lower than they actually were.  This conduct cost consumers in excess of $20 million between 2004 and 2012.

4.  Absent anticompetitive conduct by Checkpoint, USS could have penetrated the relevant markets prior to 2012 because of its low cost to supply RF[-EAS] systems.  Based on this, I calculate damages to USS to be at least $27 million.

Shehadeh Report at ¶2.

3

Checkpoint moved to exclude virtually all of Shehadeh's opinions.  In an earlier Report and Recommendation, the Special Master examined these opinions in detail and recommended Checkpoint's motion be granted in part and denied in part.  *See Shehadeh R&R* (docket no. 497) [2015 WL 6082122].

Of particular relevance to the instant Report are Shehadeh's opinions regarding bundling.  As noted, Shehadeh opined that Checkpoint engaged in anticompetitive conduct in the relevant markets through the use of bundle discounts.  To support this opinion, Shehadeh evaluated whether Checkpoint's bundling of RF-EAS products it sold to Walgreens, CVS, Rite Aid, and Albertson's was anticompetitive under the economic test set out in *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008).  The *PeaceHealth* test applies when a bundle contains both competitive and non-competitive products; a bundle discount is exclusionary when, "after allocating the discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them."  *PeaceHealth*, 515 F.3d at 910. Applying this test, Shehadeh found the discounts from list prices for products for which Checkpoint does not face significant competition (including towers, deactivators, and services) are so substantial they would result in below-cost prices if allocated to the products for which Checkpoint does face competition (labels and tags).

Checkpoint asserted Shehadeh's bundling opinions were inadmissible for two reasons: the *PeaceHealth* test does not apply in this case as a matter of law; and Shehadeh did not apply the test reliably.  The Special Master concluded Checkpoint's arguments were not well-taken and Shehadeh's bundling opinions were admissible.  *See Shehadeh R&R* at 23-27.

In addition to moving to exclude Shehadeh's opinions, Checkpoint retained two experts to challenge Shehadeh's analyses and offer rebuttal opinions.  Checkpoint retained Dr. Barry Harris to rebut

4

Shehadeh's analysis of liability, and Dr. Michael Keeley to rebut Shehadeh's analysis of damages.  Both

of these experts assail Shehadeh's *PeaceHealth* analysis and offer the contrary opinion that Checkpoint's

bundling discounts do not violate the *PeaceHealth* test.

Just as Checkpoint sought to exclude Shehadeh's bundling opinions, USS seeks to exclude Harris's

and Keeley's rebuttal bundling opinions.  (USS did not move to exclude any of Harris's and Keeley's other

rebuttal opinions.[3])  Accordingly, this Report examines in detail the *PeaceHealth* test for anticompetitive

bundling, when its application is appropriate, and whether Harris and Keeley reliably apply that test.


## II.    Legal Standard.

Pursuant to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S.

579 (1993), trial courts must serve a "gatekeeping" role with respect to expert testimony to "ensure that

any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Id.* at 589.  This

---

[3]  Harris summarizes his conclusions at ¶¶173-174 of his report (quoted below).  In its motion, USS only challenges the admissibility of the underlined conclusion; except to the extent discussed in this Report, USS does not directly seek to exclude Harris's other opinions.

173.    In conclusion, I find that the relevant antitrust market is at least as broad as all EAS systems and likely also includes non-EAS products.  Dr. Shehadeh's alleged market of sales of RF EAS systems to F&D retailers ignores the decisions by many F&D retailers to use AM EAS or not to use any EAS system.  I also find that Checkpoint is not a monopolist for RF EAS sales to F&D retailers.

174.    I have also concluded that Dr. Shehadeh's and USS's foreclosure claims make no economic sense.  <u>Checkpoint's discounts do not violate the *PeaceHealth* cost test or a conventional predatory pricing test</u>.  Dr. Shehadeh has not shown that Checkpoint has exercised market power.  Furthermore, Checkpoint's actions could not foreclose competition because USS and other competitors had ample opportunities to make sales other than to F&D retailers. There is no indication that USS is being foreclosed from the market or that competition has been harmed by Checkpoint's behavior.

Harris report at 89-90 (underlining added).  As for Keeley, his conclusions are summarized at ¶¶14-18 of his report, and USS objects to those opinions to the same extent as it objects to Harris's opinions, and also because they are cumulative.

gatekeeping function applies to scientific expert testimony as well as other expert testimony involving technical or specialized knowledge.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  The requirement that expert testimony be reliable is codified in Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)  the testimony is based on sufficient facts or data;
> (c)  the testimony is the product of reliable principles and methods; and
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A trial court "has 'considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable,'" *United States v. Sanders*, 59 Fed. Appx. 765, 767 (6th Cir. 2003) (quoting *Kumho Tire*, 526 U.S. at 152); and the test for determining reliability is "a flexible one," *Daubert*, 509 U.S. at 594.  The Supreme Court has articulated several factors that should guide the trial court's decision on the admissibility of proposed expert testimony, including: (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; (4) the existence of standards controlling the technique's operation; and (5) the level of the theory's or technique's acceptance within the relevant discipline.  *Daubert*, 509 U.S. at 593-94.  The factors identified in *Daubert*, however, are not definitive or exhaustive, and the trial judge enjoys broad latitude to use other factors to evaluate reliability.  *Kumho Tire*, 526 U.S. at 153.  Moreover, the factors identified in *Daubert* are not dispositive in every case and "should be applied only 'where they are reasonable measures of the reliability of expert testimony.'"  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *Gross v. Commissioner of Internal*

6

*Revenue*, 272 F.3d 333, 339 (6th Cir. 2001)).

A trial court's scrutiny of expert testimony balances "a liberal admissibility standard for relevant evidence on the one hand [against] the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc*., 563 F.3d 171, 176–77 (6th Cir. 2009).  Accordingly, a court should exclude an expert's testimony when it amounts to "mere guess or speculation," but challenges to the accuracy of an expert's conclusions or factual basis generally "bear on the weight of the evidence rather than on its admissibility," and are admissible.  *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993); *see Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 671 (6th Cir. 2010) ("no matter how good experts' credentials may be, they are not permitted to speculate") (internal quotation marks omitted).  When an expert provides a reliable foundation for reaching his or her conclusions, the weight afforded to that testimony is a question for the jury, not the trial court.  *In re Scrap Metal*, 527 F.3d at 529–30; *see Burgett v. Troy-Bilt*, LLC, 579 F. App'x 372, 376-77 (6th Cir. 2014) ("A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel.").  In other words, the trial court's gatekeeping role "is not intended to serve as a replacement for the adversary system."  Fed. R. Evid. 702, advisory committee notes, 2000 amendments.  Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S., at 596.  Ultimately, "rejection of expert testimony is the exception, rather than the rule," and courts will "generally permit" erroneous or weak expert testimony as long as it has "some support" in the record.  *In re Scrap Metal*, 527 F.3d at 530 (citations omitted).

7

## III.    Analysis.

USS and Checkpoint agree that, in the Sixth Circuit, the appropriate test to determine whether a discount on a multi-product bundle is anticompetitive is set out in *PeaceHealth*.  *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 273-74 (6th Cir. 2015) (adopting the *PeaceHealth* test and rejecting an alternative approach used by the Third Circuit in *LePage's, Inc. v. 3M*, 324 F.3d 141 (3rd Cir. 2003)). USS argues, however, that "Checkpoint's economists, Drs. Harris and Keeley, failed to apply the *PeaceHealth* test as articulated by the *PeaceHealth* court."  Motion at 3 (docket no. 306).  Analysis of USS's argument must begin with a short primer on the law governing anticompetitive discounts.[4]

### A.    Tests for Anticompetitive Pricing.

### 1.    Discount on a Single Product.

To begin, "when a discount is offered on a *single* product," the question of whether the discount is lawful is governed by "antitrust's ordinary predatory pricing rule." Phillip E. Areeda & Herbert Hovenkamp, IIIA *Antitrust Law* ¶749a at 310 (3rd ed. 2008) (hereinafter, "*Antitrust Law*") (emphasis added).  The rule has been stated as follows: "in a single product predatory pricing case, a plaintiff must prove (1) that its rival's low prices were below an appropriate measure of its rival's costs and (2) that its rival 'had a . . . dangerous probability of recouping its investment in below-cost prices.'"  *PeaceHealth*, 515 F.3d at 898 (quoting  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224

---

[4]  To demonstrate attempted monopolization under Section 2 of the Sherman Act, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  The *PeaceHealth* court examined only "the first element of the *Spectrum Sports* test, the conduct element."  *PeaceHealth*, 515 F.3d at 894.  Similarly, this Report focuses only on the parties' experts' opinions related to the conduct element.

(1993)).

As an example, imagine two companies, Acme and Bingo, both of which normally sell widgets at the competitive price of $3.00.  Bingo then accuses Acme of offering anticompetitive price discounts.  The first prong of the predatory pricing rule would require Bingo to show (for example) that Acme's costs for producing a widget were $1.50, but it was selling the widget at a 10-cent loss, for $1.40 (instead of the normal price of $3.00, for a $1.50 profit).  The second prong would require Bingo to show that Acme had a very high likelihood of recouping all of its 10-cent-per-widget losses by later increasing its price for widgets to supracompetitive levels – say, $4.00 – after it drove Bingo out of business.  In this example, a discount of $1.40 off the normal competitive price of $3.00 would *not* be unlawful, because Acme would still be selling the widget for ten cents above its $1.50 cost; in contrast, a discount of $1.60 could be predatory.[5]

### 2.     Discount on Multiple Products.

When a bundle discount is offered on *more than* one product, the question of whether the discount is lawful is governed by a different standard.  Specifically, the *PeaceHealth* test applies in cases where

---

[5]  More simply, if Acme sells widgets for less than it costs to produce them, it is engaging in exclusionary conduct.  Shehadeh applies the term "excess discount" to describe the extent to which the effective discounted price of a product falls below its cost (or, saying the same thing a different way, the extent to which the amount of the discount exceeds profit margin).  *See, e.g.,* Shehadeh report ¶57 at 32 ("I observe a discount more than $1 million in excess of the gross margin earned on sales of competitive RF EAS accessories"); *id.* Fig. 7 at 33 (referring to this calculation as "excess discount").

For example, if Acme's cost for producing a widget is $1.50, and it normally sells the widget for $3.00, but it offers a discount of $1.60, then: (1) the normal gross margin is $1.50 ($3.00 price minus $1.50 cost); (2) the $1.60 discount pushes the widget's effective discounted price to $1.40 ($3.00 price minus $1.60 discount); and (3) the "excess discount" is ten cents (the difference between the widget's $1.40 effective discounted price and its $1.50 cost; which is also equal to the $1.60 discount amount minus the $1.50 normal gross margin).  "Excess discount" is essentially a measure of the extent to which the discount is anticompetitive.

the defendant has engaged in "bundling" – that is, "the practice of offering, for a single price, two or more goods or services that could be sold separately." *PeaceHealth*, 515 F.3d at 894.  As an example, in addition to selling widgets for $3.00, Acme may also sell: (1) a gizmo for $5.00, and (2) a widget-gizmo combination for $5.25.  See Chart 1 below.  The combination price affords the consumer a bundle discount of $2.75 (column 5) off the total price of $8.00 for the two products sold separately (column 3).  In this circumstance, the question becomes: if Bingo sells only widgets, not gizmos, how do we determine if Acme's bundle discount is anticompetitive?

| **CHART 1** | 1 | 2 | 3 (= 1 + 2) | 4 | 5 (= 3 − 4) | 6 (= 1 − 5) |
|---|---|---|---|---|---|---|
| | Widget | Gizmo | Total if Sold Separately | Total if Sold as a Bundle | Bundle Discount | Effective Discounted Widget Price |
| Bingo's price | $    3.00 | — | — | — | — | — |
| Acme's price | $    3.00 | $    5.00 | $    8.00 | $    5.25 | $    2.75 | $    0.25 |
| Acme's cost | $    1.50 | $    2.50 | $    4.00 | $    4.00 | | |
| Acme's profit | $    1.50 | $    2.50 | $    4.00 | $    1.25 | | |

The *PeaceHealth* test answers this question as follows: a bundle is anticompetitive when, "after allocating the discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them." *PeaceHealth*, 515 F.3d at 910.  Applying this test to our example, the total $2.75 discount on Acme's widget-gizmo bundle is allocated to the widget's normal price of $3.00, yielding an effective discounted widget price of 25 cents.  Since this discounted price is less than Acme's $1.50 cost of producing widgets, the discount is anticompetitive.[6]  The "excess discount" in this example is $1.25, meaning Acme's $2.75 bundle discount pushed its effective widget price to $1.25 below its $1.50 cost (and

---

[6]  "Of course, even if the exclusionary conduct element is satisfied by bundled discounts at price levels that yield a conclusion of below-cost sales, under the appropriate measure, there cannot be Sherman Act §2 liability for attempted monopolization unless the other elements of a specific intent to monopolize and dangerous probability of success are satisfied." *PeaceHealth*, 515 F.3d at 914 n.13.

10

equivalently, the $2.75 discount amount exceeds the widget profit margin of $1.50 by $1.25).[7]

---

[7] As noted, the *PeaceHealth* test for bundle discounts applies when the defendant sells a bundle of products (say, a widget and a gizmo) and the plaintiff sells fewer than all of those same products (say, only a widget). *See PeaceHealth*, 515 F.3d at 907 ("To see whether a package price is 'exclusionary' . . . one simply attributes the entire discount on all products in the package to the product for which exclusion is claimed. If the resulting price is less than the defendant's cost, then the package discount is exclusionary as against a rival *who makes only one of the two goods in the package*.") (quoting 3 *Antitrust Law* ¶749b2 at 335–36 (Supp. 2006) (emphasis added)). Thus, if plaintiff Bingo sells widgets *and* gizmos, just as defendant Acme does, then the test for whether Acme's bundle discount is anticompetitive is instead the predatory pricing test, which is applied to the entire bundle. *See* IIIA *Antitrust Law* ¶749d4 at 331-32 (3rd ed. 2008) ("if the market contains at least one other significant firm [that] offers the same package that the defendant is discounting," then "only a package that is sold at a price less than the cost of producing all items in the package can exclude"); *id.* ¶749d3 at 327 (this "situation is adequately addressed under the law of predatory pricing"); *id.* ¶749d4 at 331 n.93 (citing *Invacare Corp. v. Respironics, Inc.*, 2006 WL 3022968 (N.D. Ohio Oct. 23, 2006), for the proposition that a "package discount [is] not unlawful when the plaintiff competitor produced all items in the package unless the defendant sold [the entire bundle] at prices below cost").

Returning to the example where Acme and Bingo each sell both widgets and gizmos, if (as reflected in Chart 1) Acme's costs for producing a widget and a gizmo are $1.50 and $2.50 respectively, and if Acme sells the widget-gizmo combination for $5.25 (affording a bundle discount of $2.75 off the total price of $8.00 when sold separately), then the bundle discount is not anticompetitive because Acme's total bundle price of $5.25 still exceeds its total costs of $4.00 (or equivalently, Acme's $2.75 bundle discount is less than its $4.00 total profit margin). Since Bingo also sells widgets and gizmos, it can compete fairly with Acme on price; whether Bingo can compete on price and also obtain a profit similar to Acme's depends on whether Bingo can be equally efficient (meaning, whether Bingo can produce widgets and gizmos at the same or lower costs as Acme).

In this example, where Acme and Bingo each sell both widgets *and* gizmos, Acme's cost of producing a gizmo is relevant to the question of whether Acme's discount is anticompetitive. But if Bingo sells only widgets and *not* gizmos, then the *PeaceHealth* test applies instead of the predatory pricing test, and Acme's cost for producing gizmos does not enter into the calculation. *PeaceHealth* rejected a rule that "condemns bundled discounts as anticompetitive only in the narrow cases in which the discounted price of the entire bundle [e.g., the widget-gizmo combination] does not exceed the bundling firm's incremental cost to produce the entire bundle." *PeaceHealth*, 515 F.3d at 903.

If Acme and/or Bingo also sell doodads, the analysis is essentially the same: *PeaceHealth* directs the court to group (a) the products on which the two companies compete and (b) the products on which they do not compete, and then to allocate the discount "on the entire bundle of products to the [group of] competitive . . . products." *Id.* at 910. As discussed below, this is what Shehadeh did, grouping products as "RF Hardware" and "RF Consumables." A more difficult question is presented if a third company, Copa, sells only gizmos, so that, although neither Bingo nor Copa alone can match Acme's widget-gizmo bundle, the two Acme rivals could team up to make a similar offer. *See* IIIA *Antitrust Law* ¶749d4 at 332-33 (3rd ed. 2008) (discussing this circumstance). The parties do not raise this question directly.

3.    The Question of Defining "Discount."

The *PeaceHealth* test, then, depends on measures of cost, price, and discount.  The *PeaceHealth* court examined what the proper definition of cost should be.  *See PeaceHealth*, 515 F.3d at 909 (discussing "the appropriate measure of incremental costs in a bundled discounting case").  The court concluded that "the appropriate measure of costs for our cost-based standard is average variable cost." *Id.*

Unfortunately, however, the *PeaceHealth* court did not discuss what the proper definitions should be for price and discount.  A critical component of the test is the amount of "the discount given by the defendant on the entire bundle of products," *id.* at 910, but this amount depends on the assignment of a price to each individual product in the bundle.  For example, what if defendant Acme: (1) has a list price for gizmos of $5.50 each; (2) actually sells its gizmos for $5.00 each, if bought individually; (3) actually sells its gizmos for $4.00 each, if bought 1,000 at a time; (4) sells widgets at list price for $3.00 each, regardless of volume – no discounts available; and (5) sells the widget-gizmo combination for $5.25, regardless of volume.  See Chart 2 below.

| CHART 2 | | 1 | 2 | 3 (= 1 + 2) | 4 | 5 (= 3 − 4) | 6 (= 1 − 5) |
|---|---|---|---|---|---|---|---|
| | | Widget | Gizmo | Total if Sold Separately | Total if Sold as a Bundle | Bundle Discount | Effective Discounted Widget Price |
| 1 | Acme's **list** price | $ 3.00 | $ **5.10** | $ 8.10 | $ 5.25 | $ 2.85 | $ 0.15 |
| 2 | Acme's **actual** price (single) | $ 3.00 | $ **5.00** | $ 8.00 | $ 5.25 | $ 2.75 | $ 0.25 |
| 3 | Acme's **actual** price (volume) | $ 3.00 | $ **3.50** | $ 6.50 | $ 5.25 | $ 1.25 | $ 1.75 |
| 4 | Acme's cost | $ 1.50 | $ 2.50 | $ 4.00 | $ 4.00 | | |

12

Should Acme's bundle discount be measured as compared to its products' list prices (row one)?[8]  Or instead as compared to the prices for which its products are actually bought when sold separately, which are less than list price (row 2)?[9]  Or perhaps as compared to the prices for which the products are actually bought when sold separately with a volume discount, which are even less (row 3)?[10]  Depending upon how the amount of discount is calculated (column 5), the *PeaceHealth* test yields different results.[11]  As discussed below, this open question is addressed in USS's *Daubert* motion.

---

[8]  The widget list price of $3.00 plus the gizmo list price of $5.10 yields a total list price of $8.10, when sold separately (column 3).  The bundle discount, therefore, would be $2.85 (total list price of $8.10 minus the combination price of $5.25, column 5).  Under the *PeaceHealth* test, this entire discount would be allocated to the $3.00 price of the widget, yielding a discounted price of 15 cents (column 6).  Since it costs Acme $1.50 to produce a widget, it is effectively selling the widget below cost, so the bundle discount is anticompetitive.  The "excess discount" is $1.35 (the difference between the $0.15 effective discounted price and the $1.50 cost; or equivalently, the difference between the $2.85 bundle discount amount and the $1.50 widget profit margin).

[9]  The actual widget selling price of $3.00, plus the actual gizmo selling price of $5.00, yields a total selling price of $8.00, when sold separately (column 3).  The bundle discount, therefore, would be $2.75 (total selling price of $8.00 minus the combination price of $5.25, column 5).  Under the *PeaceHealth* test, this entire discount would be allocated to the $3.00 price of the widget, yielding a discounted price of 25 cents (column 6).  Since it costs Acme $1.50 to product a widget, it is effectively selling the widget below cost, so the bundle discount is anticompetitive.  The "excess discount" is $1.25 (the difference between the $0.25 effective discounted price and the $1.50 cost; or equivalently, the difference between the $2.75 bundle discount amount and the $1.50 widget profit margin).

[10]  The actual volume-discounted widget selling price of $3.00, plus the actual volume-discounted gizmo selling price of $3.50, yields a total volume-discount selling price of $6.50, when sold separately (column 3).  The bundle discount, therefore, would be $1.25 ($6.50 total volume-discounted selling price minus the combination price of $5.25, column 5).  Under the *PeaceHealth* test, this entire discount would be allocated to the $3.00 price of the widget, yielding a discounted price of $1.75 (column 6).  Since it costs Acme $1.50 to product a widget, it is effectively selling the widget at a 25-cent profit, so the bundle discount is *not* anticompetitive.

[11]  As reflected in the three footnotes immediately above, Acme's bundle is anticompetitive if the bundle discount is measured using the gizmo's list price, or using the gizmo's actual sale price with no volume discount; but the bundle is not anticompetitive if the bundle discount is measured using the gizmo's actual sale price with volume discount.

### 4.    The Question of Recoupment.

In addition to the problem of how to measure the amount of discount, the *PeaceHealth* opinion leaves open another question.  As discussed above, the second prong of the single-product predatory pricing test sets out a recoupment requirement.  The *PeaceHealth* court debated whether to incorporate this recoupment requirement into its test for whether a multiple-product bundling discount is anticompetitive. The court observed that the Antitrust Modernization Commission ("AMC") believed a recoupment requirement was appropriate: "the AMC's proposed standard in bundled discounting cases, in addition to requiring below-cost pricing, also contains [the element] . . . that there is a dangerous probability that the defendant will recoup its investment in the bundled discounting program."  *Id.* at 910 n.21.  Nonetheless, the *PeaceHealth* court rejected the AMC's recommendation that the test include a recoupment requirement, because it is possible for "a bundled discounter [to] exclude its rivals who do not sell as many product lines even when the bundle as a whole, and the individual products within it, are priced above the discounter's

14

incremental cost to produce them." *Id.*[12] The court explained: "a conclusion of below-cost sales under the discount attribution standard may occur in some cases even where there is not an actual loss because the bundle is sold at a price exceeding incremental cost. In such a case, we do not think it is analytically helpful to think in terms of recoupment of a loss that did not occur." *Id.*

This conclusion bears repeating, but with emphasis: "below-cost sales under the discount attribution standard *may occur in some cases* even where there is not an actual loss because the bundle is sold at a

---

[12] For examples of this situation, see: (1) *PeaceHealth*, 515 F.3d at 896-97 (quoting *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F.Supp. 455, 467 (S.D.N.Y.1996)), and (2) IIIA *Antitrust Law* ¶749d3 at 327 (3rd ed. 2008). A similar example is set out below in Chart 3.

| CHART 3 | 1 | 2 | 3 (= 1 + 2) | 4 | 5 (= 3 − 4) | 6 (= 1 − 5) |
|---|---|---|---|---|---|---|
| | Widget | Gizmo | Total if Sold Separately | Total if Sold as a Bundle | Bundle Discount | Effective Discounted Widget Price |
| Bingo's price | $ 3.00 | — | — | — | — | — |
| Bingo's cost | $ 1.25 | — | — | — | | |
| Bingo's profit | $ 1.75 | — | — | — | | |
| Acme's price | $ 3.00 | $ 5.00 | $ 8.00 | $ 5.25 | $ 2.75 | $ 0.25 |
| Acme's cost | $ 1.50 | $ 2.50 | $ 4.00 | $ 4.00 | | |
| Acme's profit | $ 1.50 | $ 2.50 | $ 4.00 | $ 1.25 | | |

In this example, Acme sells widgets for $3.00 at a profit of $1.50 (column 1), and gizmos for $5.00 at a profit of $2.50 (column 2). Acme also sells the widget-gizmo bundle under the terms "buy both a widget and a gizmo, get the widget for $2.25 and the gizmo for $3.00 – a savings of $2.75!" This yields a bundle price of $5.25 and a bundle profit of $1.25 (column 4).

Allocating the entire bundle discount of $2.75 to Acme's widget price of $3.00 shows Acme is effectively selling its widget at 25 cents, or below its $1.50 cost (an "excess discount" of $1.25), failing the *PeaceHealth* test. This is true even though, given the way Acme prices its bundle, it is selling: (1) its widget above cost (price $2.25, cost $1.50); (2) its gizmo above cost (price $3.00, cost $2.50); and (3) its bundle above cost (price $5.25, cost $4.00).

To compete against Acme's bundle price of $5.25, Bingo would have to sell its widget at 25 cents – because a gizmo sold separately by Acme costs $5.00 – which is less than Bingo's cost to produce a widget. Thus, Acme's bundle discount would force Bingo out of the widget business, even though Bingo produces widgets more efficiently (that is, more cheaply) than Acme. Note that, to succeed under this scheme, Acme has no below-cost sales losses it would later need to recoup. Indeed, once Bingo goes out of business, Acme's profits will increase even if it simply reverts to its earlier prices of $3.00 for a widget and $5.00 for a gizmo (and not a supracompetitive widget price), because Acme will obtain all of the widget sales that once went to Bingo (assuming no other rivals).

price exceeding incremental cost.  *In such a case*, we do not think it is analytically helpful to think in terms of recoupment of a loss that did not occur."  *Id.* (emphasis added).  The question left open by *PeaceHealth*, then, is what about *other* cases, where the evidence allows a fact-finder to conclude the bundle *is* sold at a price below cost?  And further, what if increased prices is the only claimed antitrust injury?  As discussed below, the issue of recoupment is also addressed in USS's *Daubert* motion.


  **B.**  **Shehadeh's Bundling Opinions.**

  Before examining the admissibility of Harris's and Keeley's rebuttal opinions, it is necessary to identify the opinions of USS's economics expert that they seek to rebut.

  Shehadeh observes that Checkpoint sells two categories of RF-EAS products: (1) "antennas [a/k/a towers], antenna accessories, deactivators, [and] deactivation accessories," and (2) "tags and labels." Report at ¶¶49-50.  Shehadeh refers to the first category as "RF Hardware," and the second category as "RF Consumables."  *Id.* ¶58.  Shehadeh asserts that, during the relevant time period, USS sold only RF Consumables: "USS was not a known supplier of towers or deactivators."  *Id.* ¶55.  Further, Checkpoint sold its RF Hardware and its RF Consumables as a bundle.  *See id.* ¶54 (Checkpoint "[b]undl[ed] towers, services, and deactivators that USS and other smaller suppliers could not offer at sufficient scale" with labels and tags).  Based on these assertions, Shehadeh asserts the proper standard for assessing whether Checkpoint's bundle prices were anticompetitive is the *PeaceHealth* test.

  Shehadeh then concludes "Checkpoint's bundling terms violate the economic test described in [*PeaceHealth*]."  *Id.* ¶55.  To reach this conclusion, Shehadeh: (a) determined the list prices of all of the RF Hardware and the actual revenue for all of the RF Consumables that Checkpoint sold to its four largest F&D customers during the relevant period ($███M and $███M, respectively, for a total of $███M);

(b) determined the bundle sales prices Checkpoint actually received for its RF Hardware and RF Consumables from those customers ($▮M); (c) calculated Checkpoint's bundle discount by subtracting the latter from the former ($149.3M); and (d) determined the total cost of the RF Consumables Checkpoint sold to these customers during the relevant period ($▮M).[13]  See Chart 4 below (using numbers culled from Shehadeh report at 33, figure 7).

| CHART 4 | 1 | 2 | 3 (= 1 + 2) | 4 | 5 (= 3 − 4) | 6 (= 1 − 5) |
|---|---|---|---|---|---|---|
| | RF Consumables | RF Hardware | Total if Sold Separately | Total Sold as a Bundle | Bundle Discount | Effective Discounted Consumables Price |
| Checkpoint's price | $ ▮ M | $ ▮ M | $ ▮ M | $ ▮ M | $ 149.3M | $ – ▮ M |
| Checkpoint's cost | $ ▮ M | — | — | — | | |
| Checkpoint's profit | $ ▮ M | — | — | — | | |

Shehadeh's calculation showed that Checkpoint "sold the competitive product or products [RF Consumables] below its average variable cost of producing them," *PeaceHealth*, 515 F.3d at 910 – that is, the total bundle discount ($149.3M), when applied to the actual revenue it received for RF Consumables ($▮M), yielded a negative effective discounted price (-$▮M), which was less than Checkpoint's total

---

[13]  Checkpoint's four largest customers were Albertsons, CVS, Rite Aid, and Walgreens, and the relevant time period is 2004-2012.  Checkpoint's "list prices" in Shehadeh's analysis were "based on the 'Unit Standard Price' field in Checkpoint's Oracle transaction data."  Shehadeh report at 33 n.1.
When calculating the "total discount" of $149.3M, Shehadeh actually measured only the discount between list price and actual price for RF Hardware ($▮M - $▮M) – he did not determine list price for RF Consumables, so he did not include in the bundled discount any difference (either positive or negative) between list price and actual revenue ($▮M) for RF Consumables.  Shehadeh's calculation, then, may understate the extent of the bundle discount given by Checkpoint.  Shehadeh did not calculate the total cost or profit on RF Hardware.

cost of the RF Consumables ($██M).  *See* Shehadeh report at 33, figure 7.[14]  Accordingly, Shehadeh's

calculation of the "excess discount" is $██M (the difference between the - $██M effective discounted

price of the RF Consumables and their $██M cost; or equivalently, the difference between the $149.3M

bundle discount and the $██M profit margin).  As Checkpoint puts it, Shehadeh calculates that, during

the relevant time period, "when the total discount was applied to the competitive products, the resulting

amount paid by Checkpoint's customers was approximately $██ million less than Checkpoint's total

costs of those products."  Checkpoint response at 3 (docket no. 351).  Put simply, according to Shehadeh,

Checkpoint sold its RF Consumables to  Albertsons, CVS, Rite Aid, and Walgreens during the relevant

time period at a massive loss.  Indeed, Shehadeh essentially opines that Checkpoint paid its customers $██

million to take the RF Consumables with the bundled RF Hardware.

In rebuttal, Checkpoint's experts take issue with: (1) Shehadeh's opinion that the *PeaceHealth* test

applies, as opposed to the predatory pricing test; (2) the method Shehadeh uses for calculating discount

when applying the *PeaceHealth* test; and (3) Shehadeh's failure to examine whether Checkpoint could ever

recoup the enormous discounts it supposedly gave.  Each of these issues is examined below.


### C.    Harris's Predatory Pricing Opinions.

As explained above in Sections III.A.1-2, the test applicable to a claim of an illegal bundle discount

depends on whether the plaintiff sells *all of the same products* in the defendant's bundle, or *fewer than all*

*of the same products*.  If the plaintiff sells all of the same products, then the predatory price test applies;

---

[14]  Shehadeh also undertook the same *PeaceHealth* test calculation using Checkpoint's "catalog
prices" instead of its "list prices," where catalog prices "are based on the lowest volume-discounted
catalog price in each year."  Shehadeh report at 33 n.8.  Shehadeh determined that Checkpoint failed the
*PeaceHealth* test using catalog prices, as well, yielding an "excess discount" of $43.9M.  Shehadeh report
at 33, figure 7.

if fewer products, then the *PeaceHealth* test applies.  *See* footnote 7, above.  Shehadeh opines that the *PeaceHealth* test applies because Checkpoint sells both RF Hardware (towers and deactivators) and RF Consumables (labels and tags), while USS sells only RF Consumables.

In rebuttal, however, Harris opines that Shehadeh should have "use[d] a traditional predatory pricing cost test rather than using the *PeaceHealth* cost test."  Harris report ¶26 at p.11.  Harris points out that Shehadeh "concludes that (1) 'USS could have sold towers along with labels and tags at least as early as 2007,' and (2) production could easily have been increased to accommodate USS sales over the relevant period."  *Id.* (quoting Shehadeh report at 50 n.200).  Harris asserts that Shehadeh's "findings imply that since at least 2007 USS has had the ability to supply [*all* of the same products contained in] the bundles it alleges Checkpoint used to engage in foreclosure and that USS could have supplied the bundles at a lower cost than Checkpoint."  *Id.*  In these circumstances, Harris opines, "the economics literature" calls for a predatory pricing test, not a *PeaceHealth* test; furthermore, "a traditional predatory pricing cost test . . . indicate[s] that Checkpoint has not engaged in predatory pricing."  *Id.; see also id.* ¶97 at 50 ("Dr. Shehadeh also claims that USS could offer a full range of EAS products by at least 2007. As I discuss below, under these circumstances a conventional predatory pricing analysis is more appropriate than a *PeaceHealth* cost test – and Checkpoint's pricing was well above predatory levels.").

USS objects that Harris's predatory pricing analysis must be excluded because: (1) determination of whether the predatory pricing test or the *PeaceHealth* test applies "pertains to a question of law, which is reserved for the Court, not Dr. Harris;" and (2) Harris's opinion is "factually groundless, as the record is undisputed that USS did not have the ability to provide towers and service at a sufficient volume to compete with the bundles at issue to CVS, Walgreen's, Rite Aid, and Albertsons."  Motion at 4, 5 (docket no. 306).

The Special Master disagrees with USS's first argument.  If the material facts were in dispute regarding whether USS had the capacity to sell towers and deactivators, then Checkpoint could argue that: (a) USS did, in fact, sell all of the same products in Checkpoint's bundle, and (b) accordingly, the predatory pricing analysis was the appropriate test.  But the Special Master agrees with USS's second argument: there is no genuine dispute that USS was *not* capable of selling towers or deactivators during the relevant time period; therefore the *PeaceHealth* test applies.

In its motion seeking to exclude Shehadeh's expert opinions, Checkpoint argued that Shehadeh should not be allowed to opine USS suffered damages from lost sales of RF Hardware, "because the FCC did not certify USS's RF-EAS towers and deactivators for sale in the United States until 2014[; therefore] USS was simply not allowed to sell towers or deactivators during the relevant time period of 2004-2012." *Shehadeh R&R* at 42.  The Special Master agreed with Checkpoint: "USS simply had no towers or deactivators it was allowed to sell, from which it could derive the supposedly lost profits."  *Id.* at 48.

The language that Harris quotes from Shehadeh's report – that "USS could have sold towers along with labels and tags at least as early as 2007" – is not an assertion of disputed fact but a premise used to calculate damages in a hypothetical, "but-for" world.  *See Univac Dental Co. v. Dentsply Intern., Inc*., 2010 WL 1816745 at *3 (M.D. Pa. Apr. 27, 2010) ("[in the antitrust context, plaintiffs enjoy a considerable amount of leeway in 'constructing a hypothetical world free of the defendant['s] exclusionary activities'" for purposes of estimating their damages) (quoting *LePage's Inc. v. 3M*, 324 F.3d 141, 166 (3rd Cir. 2003)). Indeed, not only is it undisputed that USS did not *actually* have available for sale FCC-approved towers or deactivators during the relevant time period, but Checkpoint's expert (Keeley) opines that, even if USS did have those products available, "a firm that small could not sell, install, and service [full RF-EAS] systems at chains with thousands of stores."  Keeley 2013 report ¶113 at 61.  In other words, the parties

20

and their experts all agree that USS could *not* sell all of the same products in Checkpoint's bundle.

Checkpoint succeeded on its argument that USS cannot obtain lost profit damages flowing from products (towers and deactivators) that it was not allowed to sell.  Checkpoint cannot argue at the same time that USS *could* sell those products, making the predatory pricing test appropriate.  Based on the undisputed facts, Harris's opinions regarding the predatory pricing test do not meet the standard that "any and all [expert] testimony or evidence admitted is not only relevant, but reliable."  *Daubert,* 509 U.S. at 589.

In sum, the Special Master agrees with USS that Harris may not opine that: (a) the *PeaceHealth* test is inapplicable, (b) the predatory pricing test should be used instead, or (c) the predatory pricing test shows Checkpoint has not engaged in anticompetitive conduct.

### D.     The Calculation of "Discount."

As Chart 2 makes clear, whether a bundle is anticompetitive under the *PeaceHealth* test may depend on how the amount of "discount" allocated to the competitive products is measured.  Shehadeh calculated that the discount given by Checkpoint relative to its list prices was $149.3 million, and the discount relative to its catalog prices was $79.1 million; either way, the bundle discount was so large that Checkpoint effectively sold RF Consumables far below its average variable cost of producing them.

In its own cross-motion seeking to exclude Shehadeh's opinions, Checkpoint argued Shehadeh's *PeaceHealth* analysis was unreliable because he should not have used list or catalog prices to measure the amount of discount.  The Special Master characterized Checkpoint's position as follows:

> Checkpoint insists the prices CVS (for example) would pay absent the bundling discount CVS received would not be Checkpoint's catalog or list prices; rather, because CVS was such a huge customer, it would still have received a discount from list price.

21

Checkpoint notes that other large customers, such as Target (and even some smaller customers) did not pay list price, even though they did not receive a bundling discount. Checkpoint concludes, therefore, that Shehadeh's calculation of "the discount given by [Checkpoint] on the entire bundle of products" was unrealistically high. *PeaceHealth*, 515 F.3d at 910.  As such, Checkpoint insists Shehadeh's allocation of this too-high discount "to [Checkpoint's] competitive product or products," and his conclusion that Checkpoint "sold the competitive product or products below its average variable cost of producing them," is demonstrably incorrect.  *PeaceHealth*, 515 F.3d at 910.

*Shehadeh R&R* at 26 n.9.  The Special Master overruled Checkpoint's cross-motion, explaining:

Checkpoint's argument asks the Court to find that Shehadeh's use of Checkpoint's own published, catalog and list prices as the benchmark for calculating discounts was an unreliable method.  The Special Master cannot conclude that comparison of a product's actual selling price with its own list price is not a reliable measure of its discount.  In other words, Checkpoint's complaint about Shehadeh's discount calculation is a matter for cross-examination, not a basis for exclusion.  The "real amount" of product discount given by Checkpoint to various retailers for various products must be determined by a finder-of-fact.

*Id.*

In its current motion to exclude Harris's opinions, USS offers arguments antipodal to the ones Checkpoint advanced earlier.  Harris opines that the discount calculation under *PeaceHealth* "should not include any discount that such large customers would receive without the bundle."  Harris report ¶117 at 59.  In other words, Harris contends the discount should be calculated by subtracting (a) the discounted bundle price from (b) the total of the *already-discounted* prices available even absent any bundle discount.  Harris observes, for example, that Checkpoint routinely gave hefty price discounts to other large retailers outside of the F&D market – such as Kohl's and Target – even though those retailers did not buy products in a bundle.[15]  Harris opines that the proper measure under *PeaceHealth* is only that amount of *additional* discount "used to induce the purchase of the bundle."  *Id.* ¶116 at 59.  Using Kohl's and Target as a

_____

[15] USS argues the discounted prices received by Kohl's and Target are, in fact, also bundle prices, so Harris's reference point is false.  Motion at 8 (docket no. 306).

22

barometer, Harris concludes that: (1) Checkpoint would have provided Albertsons, CVS, Rite Aid, and Walgreens with a ██% discount even without any bundling; (2) Checkpoint actually provided these four retailers a ██% bundle discount; and (3) therefore, the relevant, true discount under *PeaceHealth* is only 3.1%. Using this analysis, Harris's calculations show that "Checkpoint's discounts to F&D retail customers do not violate the *PeaceHealth* cost test." *Id.* ¶119 at 61.[16]

Just as Checkpoint objected to Shehadeh's use of list prices to calculate the bundle discount, USS objects to Harris's use of Checkpoint's "otherwise-discounted" prices as the starting point from which to calculate discount. USS notes that the *PeaceHealth* court described its own standard as follows: "**the full amount of the discounts** given by the defendant on the bundle are allocated to the competitive product or products. If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundle discount is exclusionary for the purpose of §2 [of the Sherman Act]." *PeaceHealth*, 515 F.3d at 906 (emphasis added); *see id.* at 909 ("a plaintiff who challenges a package discount as anticompetitive must prove that, when **the full amount of the discounts** given by the defendant is allocated to the competitive product or products, the resulting price of the competitive product or products is below the defendant's incremental cost to produce them") (emphasis added).

_____

[16] Harris puts it this way: "Whether or not a discount that induces customers to purchase a bundle is successful does not depend on list prices or the catalog prices that Albertsons, CVS, Rite Aid or Walgreens would not likely pay even if the components of the bundle were sold separately. For example, if these buyers would have paid 40% of the list price (i.e., 60% off list) even if they purchased the 'non-competitive products' separately outside a bundle, then it is improper to include this full 60% discount off the list price as a discount associated with the bundle when employed in the *PeaceHealth* cost test. This inappropriate definition of the discount in conducting the *PeaceHealth* cost test overstates the discount used to induce the purchase of the bundle and can result in a finding that a bundle may be exclusionary when, in fact, the bundle is not exclusionary and actually falls into the *PeaceHealth* safe harbor." *Id.* ¶116 at 58-59.

23

Moreover, the *PeaceHealth* court cited with approval authorities that use similar language.  *See* 3 *Antitrust Law* ¶ 749b2 at 335–36 (Supp. 2006) ("To see whether a package price is 'exclusionary' . . . one simply attributes **the entire discount** on all products in the package to the product for which exclusion is claimed.  If the resulting price is less than the defendant's cost for that product, then the package discount is exclusionary as against a rival who makes only one of the two goods in the package.") (footnotes omitted, emphasis added) (quoted in *PeaceHealth*, 515 F.3d at 907); Barry Nalebuff, *Exclusionary Bundling*, 50 Antitrust Bull. 321, 329 (2005) ("The A-B bundle **discount is measured relative to the à la carte prices** of A and B.") (emphasis added) (cited at *PeaceHealth*, 515 F.3d at 907); Antitrust Modernization Comm'n, Report and Recommendations 99 (2007) ("after allocating **all discounts and rebates** attributable to the entire bundle of products to the competitive product, [the discount is anticompetitive if] the defendant sold the competitive product below its incremental cost for the competitive product")(cited at *PeaceHealth*, 515 F.3d at 907).

USS insists that, if evidence exists that *some* consumers paid "top-dollar" list price, the "full amount of the discount" given to consumers who purchased a bundle necessarily means the discount from that list price.  Therefore, USS concludes, Harris should not be allowed to offer opinions assessing a lesser amount of incremental discount that Checkpoint allegedly "used to induce the purchase of the bundle."  Harris Report ¶116 at 59.

USS's "plain language" argument has some appeal, because it would provide a simple, clear-cut application of the *PeaceHealth* test.  But the Special Master must reject USS's position in light of other, cautionary language in the *PeaceHealth* opinion.  *PeaceHealth* warns repeatedly that "price cutting is a practice the antitrust laws aim to promote."  *PeaceHealth*, 515 F.3d at 896 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)); *see also id.* at 896 ("we should not be too quick to

24

condemn price-reducing bundled discounts as anticompetitive, lest we end up with a rule that discourages legitimate price competition").[17]  Accordingly, the *PeaceHealth* court wrestled with the question, "How are we to discern where antitrust law draws the line between bundled discounts that are procompetitive and part of the normal rough-and-tumble of our competitive economy and bundled discounts, offered by firms holding or on the verge of gaining monopoly power in the relevant market, that harm competition and are thus proscribed by § 2 of the Sherman Act?"  *Id.* at 897.  Noting that "there is limited judicial experience with bundled discounts, and academic inquiry into the competitive effects of bundled discounts is only beginning," the *PeaceHealth* court concluded that any rule it adopted should show "a strong concern for false positives and low risk of false negatives."  *Id.* at 908 (quoting Brief for United States as Amicus Curiae at 14, *3M Co. v. LePage's Inc.*, 542 U.S. 953 (2004)).  *See also* IIIA *Antitrust Law* ¶749d4 at 331-32 (3rd ed. 2008) (warning that a test for anticompetitive discounting practices may carry "the danger of overdeterrence, or 'false positives'").  Accordingly, the court described the test it adopted as one that "ensures that the only bundled discounts condemned as exclusionary are those that would exclude an

---

[17]  *See also id.* at 901 ("the Supreme Court has forcefully suggested that we should not condemn prices that are above some measure of incremental cost"); *id.* ("[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition") (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993)); *id.* ("the [Supreme] Court's opinions strongly suggest that, in the normal case, above-cost pricing will not be considered exclusionary conduct for antitrust purposes, and the Court's reasoning poses a strong caution against condemning bundled discounts that result in prices above a relevant measure of costs"); *id.* at 902  ("The [Supreme] Court's reasoning and conclusions . . . show a measured concern to leave unhampered pricing practices that might benefit consumers, absent the clearest showing that an injury to the competitive process will result."); *id.* at 905 n.5 ("The frequency with which we see bundled discounts in varied contexts does not insulate such discounts from antitrust review, but it heightens the need to ensure that the rule adopted does not expose inventive and legitimate forms of price competition to an overbroad liability standard.").

25

equally efficient producer of the competitive product or products."  *PeaceHealth*, 515 F.3d at 909.[18]

In light of these warnings, the Special Master recommends Harris be permitted to offer opinions that the relevant measure of discount under *PeaceHealth* is the amount that induces the customer to purchase the bundle, which may be less than the amount of the discount from list price.  Allowing this opinion more closely "ensures that the only bundled discounts condemned as exclusionary are those that would exclude an equally efficient [competitor]."  *Id.*  In a competitive market, equally efficient competitors will offer similar prices, including similar non-bundle price discounts (such as pure volume discounts).  These non-bundle price discounts are normally not exclusionary – they are procompetitive and benefit consumers – so an "anti-bundling rule" that condemns a non-bundle price discount is hyper-deterrent.  Allowing Harris to offer his opinion mitigates this risk of a false positive result.[19]

Further, Harris and Shehadeh both recognize that Checkpoint used different prices for different

---

[18] The *PeaceHealth* court observed that the standard it adopted would "allow . . . difficult issues to further percolate in the lower courts."  *Id.* at 908.  This Report falls squarely under the rubric of that legal percolation.

[19] Professor Nalebuff echoes this thought.  Under the topic of "measuring price," he writes: "Even when the monopolist lists separate prices for goods A and B as part of the bundle, these prices may not correspond to the true economic prices. The correct price to attribute to good B is how much more the customer would have to pay to buy both A and B from the monopolist compared to A alone."  Nalebuff, *Exclusionary Bundling*, 50 Antitrust Bull. at 329.

Harris essentially argues that Checkpoint's "true economic prices" for Albertsons, CVS, Rite Aid, and Walgreens are not Checkpoint's list prices but the volume-discounted prices Checkpoint would give to any large consumer (such as Kohl's or Target).  Thus, according to Harris, a bundle discount given to a large customer may include two species of price relief: (i) a volume discount available to any large customer, and (ii) an additional discount given for buying a bundle of products.  Harris argues Shehadeh should not include the former specie of price relief in his calculation of "excess discount."

customers, and the evidence of what Checkpoint's actual, non-bundled prices is in dispute.[20]  Some of Checkpoint's customers, both large and small, paid list price; some customers, both large and small, received volume discounts; and some customers, both large and small, bought bundles.  Based on the existing record, the magnitude of Checkpoint's bundle discount is an issue of fact for a jury to resolve. Allowing both Shehadeh and Harris to sift through all of this pricing evidence and offer opinions on what is the meaningful measure of discount will allow the fact-finder to reach a more educated and reasoned decision.  The question of "where antitrust law draws the line" between procompetitive and anticompetitive bundle discounts is likely to be given a more finely-tuned answer by allowing both experts to explain their competing analyses and the facts that support them.  *PeaceHealth*, 515 F.3d at 897.

In the end, given the factual record in this case, it is fair to allow Shehadeh to opine that the only legitimate benchmark to measure the amount of Checkpoint's bundle discount is its highest list price; and it is equally fair to allow Harris to opine that the only meaningful benchmark to measure the amount of Checkpoint's bundle discount is its otherwise-available discounted prices.  Both opinions are methodologically reliable and are not "mere guess or speculation."  *L.E. Cooke Co.*, 991 F.2d at 342.  To allow Shehadeh to offer his opinion but exclude Harris's opinion would be to interpret *PeaceHealth* in a way that invites "intolerable risks of chilling legitimate price-cutting."  *Brooke Group*, 509 U.S. at 223. Accordingly, the Court should overrule USS's motion to exclude Harris's rebuttal to Shehadeh's

---

[20]  For example, in addition to arguing that Checkpoint's bundled discount should be measured against the volume-discounted prices Checkpoint would give to any large consumer, Harris also argues Shehadeh's list prices are inappropriately inflated: "For both 2003 and 2004 Dr. Shehadeh identifies the maximum list price [of a specific deactivator] as being $1,174.  Dr. Shehadeh's work product shows that $1174 is an extraordinary high value that applies only to one small customer. * * * By contrast, data used by Dr. Shehadeh show that the highest list price [for the same deactivator] applicable to Albertsons was $███ in both 2003 and 2004. * * * [Thus, Shehadeh] overstates the highest list price associated with Albertsons for this product by $███ or ███% in both 2003 and 2004 . . . ."  Harris Report ¶121 at 63-64.

*PeaceHealth* analysis.

### E.     Recoupment.

As noted earlier, the second prong of the "ordinary predatory pricing rule," IIIA *Antitrust Law* ¶749a at 310 (3ʳᵈ ed. 2008), which adheres in *single*-product cases, is that the plaintiff must prove its rival "had a reasonable prospect . . . of recouping its investment in below-cost prices." *Brooke Group*, 509 U.S. at 224.  For the reasons explained above in Section III.C, however, and based on the undisputed facts, the ordinary predatory pricing rule does not apply in this case; rather, the applicable rule is the *PeaceHealth* test for *multi*-product bundled discounts.  Furthermore, when the *PeaceHealth* court promulgated its bundling test, it "rejected [the] additional requirement[]" of showing recoupment.  IIIA *Antitrust Law* ¶749d4 at 337 (3ʳᵈ ed. 2008); *see PeaceHealth*, 515 F.3d at 910 n.21 ("We do not believe that the recoupment requirement from single product cases translates to multi-product discounting cases.").  Thus, USS argues Harris should not be allowed to offer any opinions having to do with recoupment.

Before addressing this argument, it is important to review exactly what Harris says.  First, as a matter of background, Harris discusses "the traditional theory of antitrust foreclosure" applicable to single-product anticompetitive conduct.  Harris report ¶93 at 48.  In doing so, Harris explains the "recoupment" prong of *Brooke Group*.  *Id.* at 49 n.174 (explaining that, after a competitor uses low prices to force its rivals out of the market, it would then charge "higher prices . . . to 'recoup' any losses associated with engaging in the [earlier] anticompetitive conduct").

Later, Harris mentions recoupment in the context of analyzing the alleged magnitude of Checkpoint's bundled discounts.  Specifically, Harris observes that, according to Shehadeh, the total discount Checkpoint gave to the "big four F&D retailers" (Albertsons, CVS, Rite Aid, and Walgreens) on

RF Hardware during the relevant time period was $149.3 million.  Harris asserts it would only make "economic sense" for Checkpoint to provide this discount if: (1) "there is a compensating price increase on [RF Consumables] purchased as a part of the bundle," or (2) the discounts would "cause[] Checkpoint's profits to increase in the future."  *Id.* ¶123 at 66.  Harris notes the second option is "similar to the need for recoupment in order for predatory pricing to make economic sense" in single-product cases.  *Id.* at 66 n.221.  Harris then concludes Checkpoint could not possibly succeed on the first option, as Checkpoint's sales of RF Consumables to the big four retailers during the relevant time period yielded revenue of only $███ million – obviously, not enough to compensate for a $149.3 million discount on RF Hardware.  *Id.* ¶124 at 66.  Harris also concludes (at least inferentially) that Checkpoint did not and could not pursue the second option of increased future profits, either.  *See id.* ¶145 at 76 (opining that Shehadeh "failed to show that Checkpoint's actions could prevent future competition for EAS sales to F&D retailers, as is required to demonstrate anticompetitive foreclosure.  The volume of commerce from which USS and other EAS competitors were allegedly excluded is far too small, relative to actual and potential opportunities for sale of EAS products, for this alleged exclusion to drive competitors from the market or to elevate their costs.").

USS argues that Harris "is injecting a 'recoupment' requirement into the *PeaceHealth* test," contrary to the holding of *PeaceHealth*, itself.  Motion at 6 (docket no. 306).  But Harris is merely opining whether a profit-maximizing company would undertake the bundling-discount scheme that Shehadeh describes.  Harris does not (and cannot) opine that Checkpoint's bundling scheme passes the *PeaceHealth* test so long as Checkpoint did not recoup the amount of its discounts.

Moreover, even if a defendant's bundled discount fails the *PeaceHealth* discount attribution test, the defendant is not liable unless the plaintiff also proves the defendant caused an "antitrust injury."  *See PeaceHealth*, 515 F.3d at 910 n.21 (observing that a bundling-discount plaintiff must still meet "the general

requirement of 'antitrust injury' that a plaintiff must prove in any private antitrust action").  "Antitrust injury" generally refers to "conduct that causes harm by increasing prices, reducing output, or diminishing consumer choice."  Jonathan M. Jacobson & Tracy Greer, *Twenty-One Years of Antitrust Injury: Down the Alley with Brunswick v. Pueblo Bowl-O-Mat*, 66 Antitrust L.J. 273, 286 (1998).  Harris's references to the concept of recoupment simply undergird his opinions that Checkpoint's conduct did not increase prices or decrease output, because its bundled discounts on RF Hardware were never offset by higher prices on RF Consumables, or by higher profits.  And if the only thing that Checkpoint's discounts did was to provide lower prices to consumers, then its discounts were pro-competitive.  *See Superior Prod. Partnership v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 324 n.5 (6th Cir.2015) ("When a would-be predator sets its prices too low but later finds that it cannot recoup those losses, consumers have gained. Antitrust law should not pose an obstacle to this sort of inept predation.") (citing *Brooke Group*, 509 U.S. at 223-24).

Ultimately, then, whether Checkpoint ever successfully offset its bundling discounts remains relevant to the question of antitrust injury.  Thus, it is appropriate for Harris to address the concept of recoupment, even if recoupment it is not a part of the *PeaceHealth* test.  *See Brooke Group*, 509 U.S. at 224 (a "prerequisite to holding a competitor liable under the antitrust laws for charging low prices is a demonstration that the competitor had a reasonable prospect, or, under §2 of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices"); *id.* (the "ultimate object of an unlawful predatory pricing scheme . . . is the means by which a predator profits from predation.  Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced.").  The Court should not, however, allow Harris to state or imply that recoupment is required under the *PeaceHealth* test.

In sum, to the limited extent Harris discusses the concept of recoupment, it does not work to alter or otherwise run afoul of the test set out in *PeaceHealth*.  Accordingly, the Court should overrule USS's motion to exclude Harris's discussion of recoupment.

### F.    Keeley's Opinions.

The analysis above focused on the rebuttal opinions of Harris, who addresses the question of liability.  USS also seeks to exclude the opinions of Checkpoint expert Keeley, who addresses the question of damages.  Like Harris, Keeley's opinions touch on bundling, recoupment, and the *PeaceHealth* test.  Rather than attack Keeley's opinions individually, however, USS, simply asserts that Keeley "offers opinions on the merits of Dr. Shehadeh's bundling analysis that are identical to those offered by Dr. Harris." Motion at 9 (docket no. 306).  Accordingly, USS urges Keeley's opinions regarding bundling and the *PeaceHealth* test should be excluded to the same extent as Harris's opinions.  This argument is well-taken.  The limitations described above apply to both Harris and Keeley.

In addition, USS also argues Keeley's opinions "are wholly redundant of Dr. Harris' testimony, and Checkpoint should not be allowed to bolster Dr. Harris' opinions by paying an additional economist to say the same thing.  Therefore, even if Dr. Harris' opinions are admitted, Dr. Keeley's bundling opinions should be excluded as cumulative under Rule 403." *Id.* at 9.  This argument is not well-taken.  Rule 403 states that the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . wasting time, or needlessly presenting cumulative evidence."   USS has not shown that presentation of Keeley's testimony fails this balancing test.  Indeed, "expert testimony is not rendered cumulative simply based on the number of witnesses who offer evidence at trial." *Piskura v. Taser Int'l*, 2012 WL 1267990 at *2 (S.D. Ohio Apr. 13, 2012) (citations omitted).  The fact that both Harris and

31

Keeley refer to the *PeaceHealth* test is unremarkable, given their different-but-related focus on Shehadeh's analysis.

Moreover, the Court retains the authority to limit Keeley's testimony at trial if it proves necessary. *See* Fed. R. Evid. 611(a) (directing the Court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . avoid wasting time"); *In re Welding Fume Prods. Liab. Litig.*, 2010 WL 7699456 at *80 (N.D. Ohio June 4, 2010) ("Generally, there is nothing wrong with adducing testimony from multiple experts on related (or even the same) topics . . . . Thus, rather than enter a pretrial Order limiting defendants' use of expert witnesses, the Court has dealt with this issue by citing to Fed. R. Evid. 611(a) as authority for limiting at trial any duplicative expert testimony via sustaining objections, giving sua sponte cautions to counsel, or even terminating counsel's questioning."). Exclusion of Keeley's testimony at this juncture would be premature. *See Piskura*, 2012 WL 1267990 at *2 (denying a motion to exclude purportedly cumulative expert testimony as "premature" at the summary judgment stage).

Accordingly, the Court should deny USS's motion to exclude Keeley's testimony as cumulative, but grant USS's motion to exclude Keeley's testimony to the same extent that Harris's testimony should be excluded, as outlined in Sections III.C-E of this Report.


## IV.      Time for Filing Objections.

The Court originally set a deadline of 14 calendar days for filing objections to this Report.  The Court further stated, however, that "[t]he Special Master may . . . provide in his order, finding, report, or recommendation that the period for filing objections to that particular document is some period longer than 14 calendar days, if a longer period appears warranted."  Order at 5 n.4 (docket no. 52).  Given the length

and complexity of this Report, the Special Master sets the following deadlines and page limitations for filing of objections:

(1)     objections to be filed on or before November 16, 2015 (20 pages maximum);

(2)     responses to be filed on or before December 21  (20 pages maximum); and

(3)     replies to be filed on or before January 18, 2016 (12 pages maximum).

Finally, for purposes of clarification, the previously-set deadlines and page limitations for filing of objections to the Shehadeh Report and Recommendation are:

(1)     objections to be filed on or before November 2, 2015 (25 pages maximum).

(2)     responses to be filed on or before November 23, 2015 (25 pages maximum).

(3)     replies to be filed on or before December 14, 2015 (15 pages maximum).

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**DATED**: October 19, 2015